Brian D. FIELD, Appellant,
(Defendant Below),

v.

ALEXANDER & ALEXANDER OF INDIANA, INC., Appellee,
(Plaintiff Below).

No. 2–185A20.

Court of Appeals of Indiana,
Second District.

Feb. 2, 1987.

Albert George, Bell, George, Laramore & Ost, Sydney L. Steele, Lowe, Gray, Steele & Hoffman, Indianapolis, for appellant.

Hugh E. Reynolds, Jr., David M. Haskett, Alan S. Brown, Jeffrey S. Washburn, Locke, Reynolds, Boyd & Weisell, Indianapolis, for appellee.

SHIELDS, Presiding Judge.

Brian Field appeals a judgment in favor of Alexander and Alexander Inc., his former employer, upholding a covenant not to compete. We affirm.

## ISSUES

Field raises the following issues on appeal:

1) Whether the agreement containing the covenant not to compete was executed and accepted by Field;

2) whether the agreement was supported by adequate consideration and was ancillary to Field's employment;

3) whether the terms of the covenant are unreasonable; and

4) whether a customer list was erroneously admitted into evidence after the trial.

## FACTS

Brian Field was an insurance salesman for Alexander & Alexander, Inc. (Alexander). Alexander had a stock option program as part of an overall "Long Term Capital Accumulation Program" (LTCAP) which provided incentives for employees to produce greater premium revenue and to encourage continued employment with Alexander. Participation in LTCAP was restricted to employees Alexander felt could have the greatest impact on premium revenue. Based on past sales, Brian Field was offered participation in LTCAP. In return, Field was required to agree to refrain from doing business with Alexander customers with whom he had had personal contact in the preceding two years for two years following any termination of the employment

relationship. The covenant provision reads:

"In consideration of the Corporation entering into this agreement, which you accept by your signature below, and for other good and valuable consideration, you agree that if your employment with the Corporation or any of its subsidiaries or affiliates should terminate for any reason, you will not, for a period of two years after the date of such termination, in any capacity whatsoever (including, but not limited to, as an employee, officer, director, stockholder, proprietor, partner, joint venturer, consultant or otherwise), directly or indirectly, solicit, sell, service, divert, accept or receive insurance agency, brokerage or consulting business or actuarial or employee benefits (Benefacts) business, or property tax consulting business, from, or to, any customer or active prospect of the Corporation, or any of its affiliates or subsidiaries, which you personally, alone or in combination with others, handled, serviced or solicited at any time during the two year period immediately preceding termination of your employment." [1]

Record at 465. In 1983, Alexander terminated Field, prompting this dispute as to the validity of the covenant not to compete.

## DECISION

### I. Acceptance and Execution

The 1980 LTCAP offer forwarded to Field, in addition to describing the option and performance bonus, contained the 1980 covenant and the provision that: "It will be assumed that participation [in LTCAP] has been declined if your acceptance has not been received by April 15, 1980." R. at 538. Field testified he signed the original on April 15, 1980 and mailed Alexander a copy on May 12, 1980.

Field argues a binding agreement was not reached because he failed to return his acceptance to Alexander by April 15. Alternatively, Field argues Alexander failed

---

1. In 1977 and 1978 Field entered into similar covenants pursuant to the LTCAP. Because the 1980 agreement is enforceable, we do not address the enforceability of the prior agreements.

to prove execution of the agreement as required by Indiana Rule of Trial Procedure 9.2.

### A. Acceptance

█ Field's argument fails because a limited period for acceptance of the option was not specified in the offer. Rather, the plain meaning of the provision, "[i]t will be assumed that participation has been declined if your acceptance has not been received by April 15, 1980" (R. at 538), is the offeror may assume its offer has been rejected if a response is not received by it by April 15, 1980. Nowhere does the provision state or reasonably imply the offer terminates unless it is accepted *and* the acceptance received by the offeror by April 15. Further, the parties obviously understood the plain meaning of the provision because Alexander had previously enrolled Field in its option and incentive program when Field notified Alexander of his acceptance after a date contained in similarly phrased provisions.[2]

Because the offer was not specifically limited, it was open to acceptance for a reasonable time. 1 A. Corbin, *Corbin on Contracts*, § 36 (1963). Here, neither party disputes Field's execution of the document on April 15, 1980, occurred within a reasonable time. Further, Field's delay in returning the executed option did not impede the creation of an agreement between the parties inasmuch as Alexander proceeded to enroll Field in the program. Accordingly, Field's acceptance of the agreement, his subsequent transmittal of his acceptance to Alexander, and Alexander's enrollment of Field in the program, effectively refuted the declination assumption. An agreement was reached.

█ Finally, even if the April 15, 1980 provision was construed as a limitation on the time available for accepting the option, Field's transmission to Alexander of his acceptance constituted a counteroffer which counteroffer was accepted by Alexander when it enrolled Field in LTCAP.

"An acceptance which varies the terms of the offer is considered a rejection and operates as a counteroffer which may be accepted by the original offeror by performing without objection under the terms contained in the counteroffer. *Uniroyal, Inc. v. Chambers Gasket & Mfg. Co.* (1978), 177 Ind.App. 508, 380 N.E.2d 571, 575."

*Kokomo Veterans, Inc. v. Schick* (1982), Ind.App., 439 N.E.2d 639, 644. Alexander's enrollment of Field in the program constituted its acceptance of his counteroffer. *Young v. Bryan* (1977), 178 Ind.App. 702, 368 N.E.2d 1 (Acceptance may occur through an overt act and may be expressed by acts which manifest acceptance).

### B. Execution

Field argues Alexander failed to meet its burden of proof of execution as set forth in T.R. 9.2. However, that particular trial rule was not an issue between the parties inasmuch as Field did not deny execution as required by T.R. 9.2(B). This particular subsection reads in relevant part, "execution ... shall be deemed to be established and the instrument, if otherwise admissible, shall be deemed admitted into evidence ... unless execution be denied under oath in the responsive pleading or by an affidavit filed therewith."

### II. Adequacy of Consideration-Covenant Ancillary to Employment

### A. Consideration

Field argues the instant covenant was given for past consideration and is, therefore, unenforceable. The offer made to Field read: "We are pleased to advise you that [Alexander], by action of the Executive Committee, has granted to you, as of January 31, 1980, an option to purchase ... stock...." R. at 465. It further stated Field was selected because of past sales performance. The offer also required

---

**2.** On February 10, 1977, Field received a letter from Alexander extending him the right to participate in LTCAP. This letter requested his acceptance by March 1, 1977. However, on March 11, Field received a follow up letter noting the March 1 deadline had passed and suggesting he mail his acceptance by March 15.

Field to agree not to compete with Alexander after termination of the employment relationship in order to participate in LTCAP.

Field argues the right to participate in LTCAP was a gift because it was due to past sales performance. Accordingly, because past consideration cannot support a new obligation the covenant must fail for lack of consideration. *Brown v. Addington* (1944), 114 Ind.App. 404, 52 N.E.2d 640. Further, Field argues although an implied promise to continue employment made by the employer will support a covenant not to compete, *Leatherman v. Management Advisors, Inc.* (1983), Ind., 448 N.E.2d 1048, no such promise exists here because the prospectus received by Field the same time as the offer, and incorporated by reference, stated "[n]either the Performance Bonus Plan nor any action taken hereunder shall be construed as giving to any employee the right to be retained in the employ of the Company or any Subsidiary." Record at 467. Thus, Field concludes he was an employee at will, and, therefore, an implied promise to continue employment was not made.

▮ Assuming Field was an employee at will, he received adequate consideration to support the covenant not to compete. The fact the offer was restricted to a class of people based on *past* sales performance does not require the conclusion the consideration for the option was past performance as Field contends. Rather, the consideration given by Alexander was the promise to allow employees in the defined class to participate in LTCAP in exchange for a promise not to compete. A promise is valuable consideration in Indiana, *Prell v. Trustees of Baird and Warner Mortgage*

(1979), 179 Ind.App. 642, 386 N.E.2d 1221, and in fact, the evidence is the options were worth $50,000.[3]

Accordingly, we find there was good consideration given for the covenant not to compete.

### B. Covenant Ancillary to Agreement

Field also argues the covenant is not ancillary to the LTCAP contract. Because a covenant not to compete affects a person's ability to work, courts have historically viewed such covenants as impinging on public policy as well as affecting rights and duties between two parties. *Donahue v. Permacel Tape Corp.* (1955), 234 Ind. 398, 127 N.E.2d 235.[4] Accordingly, in *Milgram v. Milgram* (1938), 105 Ind.App. 57, 12 N.E.2d 394, this court said:

" '[N]o conventional restraint of trade can be enforced unless the covenant embodying it is merely ancillary to the main purpose of a lawful contract, and necessary to protect the covenantee in the enjoyment of the legitimate fruits of the contract, or to protect him from the dangers of unjust use of those fruits by the other party. This very statement of the rule implies that the contract must be one in which there is a main purpose, to which the covenant in restraint of trade is merely ancillary.... The main purpose of the contract suggests the measure of protection needed, and furnishes a sufficiently uniform standard by which the validity of such restraints may be judicially determined. [*United States v. Addyston Pipe & Steel Co.* (1898), 85 Fed. 271, 282]' "

105 Ind.App. at 60–61, 12 N.E.2d at 395.

In a more recent decision the supreme court addressed the validity of a covenant

---

3. The fact Field did not exercise the options is irrelevant. By the terms of the 1980 option, the right to participate in the program was the consideration, not the exercise of the options.

4. In *Donahue v. Permacel Tape Corp.* (1955), 234 Ind. 398, 127 N.E.2d 235, the Court stated: "We are here concerned with one of the most basic rights of man as recognized by our Judean-Anglican civilization, 'that man is endowed by his Creator with the right to life, liberty and the pursuit of happiness.' Declaration of Indepen-

dence; Art. 1, § 1, Constitution of the State of Indiana ... Therefore ... our courts will zealously guard every individual against even his own commitments which would limit or thwart *the greatest constructive employment and enjoyment of his faculties from this moment forward,* unless the manner of his living would contravene public policy or the personal property rights of another." 234 Ind. at 410, 127 N.E.2d at 240. (emphasis in original).

not to compete contained in an offer to purchase stock. In *Woodward Ins., Inc. v. White* (1982), Ind., 437 N.E.2d 59, the supreme court expanded the *Milgram* test of enforceability. The court's *Woodward Insurance* test is whether the covenant and contract have a significant nexus to the "employment situation" so as to render the covenant ancillary to the "employment situation" and necessary to protect legitimate rights of the employer although these rights do not arise from the contract to which the covenant is attached.

■ Applying that standard to the facts of this case, LTCAP was designed to stimulate the production of premium revenue and was offered only to the employees of Alexander who, as evidenced by past performance, could have a significant impact on the profitability of the Company. Therefore, participation in LTCAP had a significant relationship to Field's employment situation and, accordingly, the trier of fact did not err in finding:

> "The covenants not to compete are ancillary to the main purpose of the Long-Term Capital Accumulation Program which is to include key employees in an incentive program in order to influence their future performance by giving them an interest in the profits of the company. And as such, the covenants not to compete are related to the employment relationship between the Plaintiff and Defendant."

Record at 303.

### III.  Whether the Covenant was Unreasonable

Field agreed for two years following the end of his employment with Alexander, he would not "solicit, sell, service, divert, accept or receive" insurance business with any customer of Alexander which he personally handled or solicited during the two years immediately preceding the end of his employment.[5]  Field asserts the covenant is unreasonably restrictive towards him, and

prohibits more than is necessary to protect Alexander's legitimate interests.

Field argues the covenant is unreasonable in that: 1) he mainly sold commercial performance bond insurance, while the covenant requires him to refrain from selling his former bond customers any type of insurance; 2) the covenant requires him to refrain from selling insurance to customers who had purchased insurance from Alexander prior to Field's termination, but who did not renew any or all of their insurance with Alexander after Field was terminated; 3) Alexander, by inaction, has destroyed its good will interest in certain customers; 4) the geographic scope of the covenant is indefinite and overbroad; and 5) the restraints unduly inhibit the free choice of customers and thus are against public policy.

Indiana first addressed the issue of enforceability of restrictive covenants relative to employment contracts in *Grand Union Tea Co. v. Walker* (1935), 208 Ind. 245, 195 N.E. 277:

> "The parties to this contract agreed to the restrictive covenant, and, if its terms are fair and reasonable, a court of equity should enforce its provisions by granting injunctive relief.  The question of whether it is reasonable depends upon circumstances, the more important of which are: Is the purpose to be obtained a fair and conscionable one, will it do greater harm to the employee than good to the employer, and if it is reasonable as between the parties, does it so injuriously affect the public as to make it void as against public policy?  (quoting *Deuerling v. City Baking Co.* (1928), 155 Md. 280, 141 Atl. 542)."

208 Ind. at 253, 195 N.E. 277.

In *Donahue v. Permacel Tape Corp.* (1955), 234 Ind. 398, 127 N.E.2d 235, the supreme court addressed the issue of what constitutes "a fair and conscionable purpose" for a restrictive covenant.  The court stated:

---

5.  The trial judge struck "active prospect" from the covenant before ordering the covenant valid and enforceable.  Alexander does not appeal that action.

"As an incident to his business, the [employer] was entitled to contract with regard to and thus to protect the good will of his business. Elements of this good will includes 'secret or confidential information,' such as the names and addresses and requirements of customers *and the advantage acquired through representative contact with the trade in the area of their application.* These are property rights which the employer is entitled to protect." (emphasis added). 234 Ind. at 410, 127 N.E.2d at 240.

Subsequently, cases have held, in industries where personal contact between the employee and customer are especially important due to similarity in the product offered by competitors, the advantage acquired through the employee's representative contact with customers is part of the employer's good will, irrespective of whether or not the employee had access to confidential information. *See Licocci v. Cardinal Associates, Inc.* (1983), Ind., 445 N.E.2d 556; *4408, Inc. v. Losure* (1978), 175 Ind.App. 658, 373 N.E.2d 899; *Frederick v. Professional Bldg. Main. Indus., Inc.* (1976), 168 Ind.App. 647, 344 N.E.2d 299; *Miller v. Frankfort Bottle Gas, Inc.* (1964), 136 Ind.App. 456, 202 N.E.2d 395.

In this case, because Alexander did not allege Field possessed confidential information, Alexander's protectible interest could only stem from Alexander's good will garnered through the representative efforts of Field. The record is replete with evidence indicating Alexander's business was closely dependent on the quality of the representative contact of its employees with customers. Granted price was oftentimes a controlling consideration, in many instances the price and type of coverage Alexander offered was so close to that offered by competitors that the personal contacts of the salesman and the development of a trusting relationship between the customer and the salesman was a key factor in Alexander securing the business. Consequently, Alexander had a legitimate good will property interest to protect. We examine that interest to determine whether the covenant was overly restrictive.

## A. Other Insurance

Field correctly asserts the covenant can be no broader than necessary to protect the good will interests of the employer, *Donahue v. Permacel Tape Corp.*, 234 Ind. at 406, 127 N.E.2d at 238. He relies on language from *Donahue* that "good will must be related to the particular transaction between the parties," 234 Ind. at 406, 127 N.E.2d at 238, to support his argument the covenant can legitimately prohibit only the sale of bond insurance to his former bond customers at Alexander. Field reasons the "particular transaction" in his case was the sale of the specific types of insurance Field sold to Alexander customers, and, thus, the covenant cannot legitimately prohibit him from selling different types of insurance to his former customers.

Field interprets the requirements of *Donahue* too narrowly and takes the "particular transaction" language out of context. The language in *Donahue* was not in reference to a restrictive covenant related to employment, but to the sale of a business. The hypothetical given in *Donahue* involved the purchaser of a business who already owned a similar business statewide in scope while the purchased business was only county-wide in scope. According to the "particular transaction" requirement, the buyer could not restrict the seller from competing in other counties in the state because the good will of the purchased business, and hence the protectable interest, only extended county-wide.

Here the good will developed by Field for Alexander attached to each customer with whom Field had contact. Thus, the "particular transaction" language limits Alexander's good will interest with respect to Field to Field's contribution, which was his relationship with these customers. It is not in accord with common sense to hold the good will established with those customers was limited to the particular types of insurance sold to an individual customer. The credibility Field established with a customer would naturally extend to other types of insurance sales.

Applying the example from *Donahue*, had the seller owned a furniture store selling furniture brands A and B, a covenant restricting him from competing within the same county would not allow him to open a new store across the street selling different brands of furniture. He would not be able to claim the "particular transaction" between he and the purchaser was a business that sold only brands A and B because it is obvious customers in search of the same type of furniture would attach to him the credibility he had developed in his former business. Similarly, Field would retain the credibility he established with any given customer from the sale of even one type of insurance when selling other types of insurance to that customer. Alexander employed Field precisely to develop that credibility and it is in the capacity of employee for Alexander that Field did so. Therefore, Alexander may validly contract with Field to prohibit Field from using that relationship for his own benefit or for the benefit of a competitor. Accordingly, the covenant may legitimately prohibit Field from selling any type of insurance to his former customers.

### B. "Customer"

Field also asserts the term "customer" in the covenant is ambiguous with respect to the scope of prohibited contact, and argues giving the term unlimited application would result in restricting contact not inimical to the legitimate interests of Alexander. The covenant in pertinent part reads: "[Y]ou will not, for a period of two years after the date of termination ... solicit ... business from any customer ... of the Corporation ... which you handled ... or solicited at any time during the two year period preceding termination." Record at 465. Field specifically argues the covenant could be read to include only customers whom Field personally serviced or solicited during the

two years prior to his termination who were still customers at the time of his termination; or, the covenant could be read to include not only customers Field serviced or solicited during the two years preceding his termination who still did business with Alexander but also anyone Field contacted in the two years regardless of their current business relationship with Alexander. Obviously, under the latter interpretation, Field would be prohibited from contacting a larger class of persons than under the former interpretation and, Field argues, would encompass persons in whom Alexander had no legitimate protectable interest. Although "[c]ourts considering the employer's interest in 'past' clients have not been receptive to the idea of affording [the employer] protection," *Seach v. Richards, Dieterle & Co.* (1982), Ind.App., 439 N.E.2d 208, 213, we do not address that question because the class of persons referred to by "any customer" in the covenant does not fairly admit of the second interpretation.

First, the covenant makes no explicit reference to past customers. To read the covenant as imposing that scope of prohibition is simply not indicated by the language of the covenant. Secondly, the covenant becomes operative when the employment relationship ends, and in the absence of express language to the contrary, must be read as fixing the scope of prohibited contact at the time of termination. Thus, the covenant contains three criteria defining the prohibition: 1) Field may not solicit or accept business for a period of two years from the time he was terminated, 2) from any person who was a customer of Alexander at the time of termination, 3) if Field had personal contact with that customer during the two year period.[6]

---

6. Field contends another unjust result of construing the covenant to prohibit contact with past customers is the prohibition against contacting people he only solicited during the two years prior to his termination. Field asserts the act of solicitation does not give rise to sufficiently significant contact to justify prohibiting his contact with that person. Because the covenant requires the person to have been a customer when Field was terminated, the solicitation was a sufficiently significant contact to warrant the prohibition of future contact. It presumably was the cause of the person becoming an Alexander customer.

In a related argument, Field states Alexander cannot have a protectable interest in persons, who although customers when Field was terminated, afterwards ceased doing business with Alexander. Field specifically argues Alexander has forfeited its good will in certain particular customers. Field advanced evidence at trial that some customers became dissatisfied with service at Alexander following Field's termination. Thus, reasons Field, Alexander, by its own inaction, destroyed any good will Field had previously imparted.

■ Field's arguments are unpersuasive because central to the reason behind a covenant not to compete is the recognition when the employee leaves or is terminated, relationships previously developed by the employee are jeopardized. Thus, a major benefit given to the employer by operation of the covenant is the time to redevelop those relationships with a new representative of the employer.[7] Because the time interval between one employee leaving and another employee taking over can be chaotic, some customer dissatisfaction is foreseeable and cannot be cause to declare the covenant unenforceable with respect to those customers.

### C. Free Choice of Customers

■ Next, Field argues the covenant is unreasonable because it restricts the free choice of customers to secure insurance from whomever they wish. Field bases his argument on language in the covenant which prohibits him from *accepting or receiving* business from Alexander customers. Although Field is correct in asserting the public interest is a factor in assessing the legitimacy of a restrictive covenant, *Grand Union, Donahue,* in this case the public is not restricted from doing business

with any company and is not precluded from doing business with Field's new employer. The public is only restricted from doing business with Field. Because Field is an employee, not the owner of a separate insurance agency, the public's freedom of trade is not meaningfully restricted.[8]

### D. Geographic Scope

■ Last, Field contends the covenant not to compete is void because it does not impose geographic boundaries on his activities. A covenant not to compete must be sufficiently specific in scope to coincide with only the legitimate interests of the employer and to allow the employee a clear understanding of what conduct is prohibited. Although one method of limiting a covenant's scope is to impose territorial boundaries, "as the specificity of limitation regarding the class of person with whom contact is prohibited increases, the need for limitation expressed in territorial terms decreases." *Seach v. Richards, Dieterle & Co.* (1982), Ind.App., 439 N.E.2d 208, 213.

In *Seach,* the class of persons with whom contact was prohibited was the past, current, and prospective clients of the accounting firm. In *Seach,* after refusing to enforce the covenant's provision applying to past and prospective clients, the court found the specificity of the class of persons sufficient to render the covenant enforceable without limitations of territory. Here, the class of persons with whom contact is prohibited is customers with whom Field had contact within two years of leaving Alexander. This class is as well defined and specific as that in *Seach,* and it is similarly enforceable without geographic limitation.

---

7. For example, construction performance bonds are only operational during the term of a construction project, and a company might have a lapse of time between construction projects.

8. Field cites *Merrill, Lynch, Pierce, Fenner, & Smith v. DeLiniere* (D.C.N.D.Ga.1983), 572 F.Supp. 246. In that case, the employee was a professional, and the court recognized "the intimate nature of the professional-client relationship" and the public's interest in being able to choose the professional services it prefers. (quoting *Singer v. Habif, Arogeti, & Wynne, P.C.* (1982), 250 Ga. 376, 297 S.E.2d 473, 475). An insurance salesman, employed by an agency, is not in a comparable position of offering a product to the customer different from that of other employees of the same agency.

## IV. Customer List

During trial, Field stressed the difficulty of recalling the customers with whom he had contact in the two years immediately preceding the end of his employment at Alexander. During final argument Alexander offered to give Field a list of persons who fell under the prohibition imposed by the covenant. In the court's findings of fact and conclusions of law, Alexander was ordered to submit the list to Field. Alexander did so, and also forwarded a copy to the court.

In his motion to correct error, Field contested the validity of the list, and attached to the motion an affidavit containing names of persons Field believed were improperly included on the list. The court denied Field's motion to correct error, and Field argues the list was thus improperly adopted as part of the court's judgment.

Although Field convincingly argues the necessity of the list being adjudicated according to due process principles of an adversarial hearing, the issue is not germane to this appeal. The trial court's declaratory judgment did not contain an adjudication of the list, and did not impose an obligation or Field with respect to the list. The trial court only ordered Alexander to submit the list to Field; it did not order Field not to solicit business from persons on the list. Consequently, the trial court failed to impose any duties upon Field concerning the list which he may appeal.[9]

## CONCLUSION

Adequate consideration was given in exchange for the covenant not to compete, and the covenant was ancillary to the employment situation of Field and Alexander. The covenant, by prohibiting contact with only those customers with whom Field had personal contact, was adequately restricted to protecting Alexander's legitimate good will interests, and was not unreasonable in prohibiting contact for two years following Field's termination. The covenant was also reasonable with respect to public policy because it did not restrict the opportunity of any person to procure insurance with any insurance agency. Consequently, the trial court did not err in finding the covenant wholly enforceable.[10] Further, the trial court did not err in consideration of the customer list.

Judgment affirmed.

BUCHANAN, J., and HOFFMAN, J., concur.

---

**9.** Following the trial court's declaratory judgment, Alexander sought to enjoin Field from what Alexander perceived as impermissible contact. The trial court granted Field's request for a stay of proceedings pending disposition of this appeal, but conditioned the stay on Field agreeing to abide by the list. Any further order requiring Field to continue to refrain from contacting persons on the list must be preceded by an adversarial hearing.

**10.** We do not address Field's contentions concerning the "blue pencil doctrine," which governs when unenforceable provisions in a covenant not to compete may be severed, thus allowing enforcement of the remaining provisions. It is not applicable to this case because the covenant is entirely enforceable.