**JAK PRODUCTIONS, INCORPORATED, an Indiana Corporation, Plaintiff–Appellee,**

v.

**Edward J. WIZA, III, Defendant–Appellant.**

No. 92–1849.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 1, 1992.

Decided Feb. 16, 1993.

* Judge Fairchild was a member of the original panel.

David J. Carr (argued), David D. Robinson, Johnson, Smith, Densborn, Wright & Heath, Indianapolis, IN, for plaintiff-appellee.

Evan E. Steger, Fred R. Biesecker (argued), Ice, Miller, Donadio & Ryan, Indianapolis, IN, Donald H. Dunnuck, Dunnuck, Teagle & Hunt, Muncie, IN, for defendant-appellant.

Before CUMMINGS and MANION, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

MANION, Circuit Judge.

JAK Productions, Inc. ("JAK") raised funds for various police organizations nationwide. John Keller, the company's president, hired Edward J. Wiza, III, who signed an employment agreement that included a covenant not to compete. After two and one-half years Wiza quit and formed his own company, taking some of JAK's customers with him. JAK sued and the district court granted a preliminary injunction against Wiza, prohibiting him for a period of one year "from directly or indirectly communicating with, soliciting or providing fund-raising events, projects or services for customers or clients of [JAK]." Wiza appeals on a variety of issues, and we affirm. We agree with the district court that pursuant to the elements of a preliminary injunction, an injunction should issue. We also reject Wiza's arguments concerning the enforcement time period and whether JAK had unclean hands. However, we modify the district court's entry regarding the scope of the word "customers" in the employment agreement, and remand for further proceedings.

## I. Background

John Keller has owned and operated JAK since 1983, soliciting charitable contributions for law enforcement associations. On March 24, 1988, Keller hired Edward Wiza to solicit and market JAK's services to various police organizations. Approximately one month later, Wiza signed a written employment contract. The agreement specified Wiza's title as "Regional Sales and Marketing Representative" and summarily described Wiza's employment responsibilities. The agreement also indicated that JAK intended to relocate from Muncie, Indiana, to the southern part of the United States, and that Wiza agreed to the move.[1] The agreement covered a number of topics including Wiza's compensation, work hours, a "best efforts" provision, the effect on Wiza's territory should additional marketing agents be hired, and a paragraph concerning non-competition. This appeal involves the application and enforcement of the non-compete paragraph, which reads:

> Wiza recognizes that he has received from the Corporation [JAK] confidential information and upon the signing of this contract will receive additional confidential information and, therefore, in consideration thereof, he agrees that, in the event of the termination of this agreement, whether by himself or by the Corporation, which termination by the Corporation may be either with or without cause, *for a period of one (1) year after such termination that he will not contact any client, customer or show sponsor of the Corporation,* telephone managers or solicitors or sales personnel, nor shall he disclose any methods, training techniques or sales material, or other information of the Corporation. Wiza further agrees that for a period of one (1) year after termination, for any cause whatsoever, he shall not, directly or indirectly, own, manage, operate, join, control, be employed by or participate in the ownership, management, operation, or control of, or be connected in any manner in any business which is competitive to

---

1. In mid–1990, JAK changed Wiza's title to general manager and vice president. Wiza was

then earning approximately $100,000.00 per year.

the business of the Corporation or its subsidiaries, or any business selling or doing business with the Corporation or its subsidiaries. Wiza acknowledges that information that he has gained by virtue of entering into this agreement with the Corporation and by reason of his performance of said contract thereafter gained information that is unique and extraordinary and he agrees that, *in the event of his breach of this agreement, the Corporation shall be entitled to injunctive relief* and to such other remedies as may be available to the Corporation.

(Emphasis added.)[2] JAK sought to enforce only the emphasized portion of the covenant not to compete. The agreement does not define the terms "client, customer or show sponsor." In JAK's experience in the fund-raising business, police associations sign multi-year contracts that may be canceled after one year. The district court found that this does not mean the business relationship is over, only that the contracts are often renegotiated. Wiza stated in his brief that "[s]ometimes customers would drop one year and come back the next; sometimes they would not come back."

In the fall of 1991, JAK planned to move its headquarters to Atlanta, Georgia. The change in locations would also involve a change in JAK's business focus; from local to statewide fund-raising. Keller told Wiza that his employment responsibilities would also change, giving him the title of room manager. Rather than make the changes, on November 25, 1991 Wiza quit. Prior to his termination, Wiza had incorporated CJW, Inc., a corporation designed to compete with JAK. Wiza had also solicited Phil Holden, of the Madison County Sheriff's Department Benevolent Association Canine Unit, to contract with Wiza directly, rather than through JAK.

In its ten-year history, as of early 1992, JAK had contracted in fifteen states and serviced over 300 fund-raisers. In 1991, JAK grossed over $4 million. The district court found that before his employment

with JAK, Wiza was not familiar with the police association fund-raising industry and had no prior knowledge of JAK's customers. At the time of the injunction hearing, however, Wiza had solicited over fifteen former JAK customers and

had entered into five contracts to perform services as a fund-raising company. All of these contracts were with JAK customers with whom Wiza had direct contact during his employment with JAK. Wiza only knew of these customers by virtue of his employment with JAK. Four of the five customers signed away from JAK by Wiza, had contracts with JAK in the last year of Wiza's employment with JAK.

None of these contracts involved customers under an existing contract with JAK at the time of Wiza's termination. Wiza has no other current contracts.

As to procedural matters, on December 11, 1991 a Delaware County, Indiana Superior Court granted JAK a temporary restraining order enforcing its written employment contract with Wiza. The venue of the case was changed to the Blackford County, Indiana Circuit Court and thereafter, on January 30, 1992, Wiza removed the case to the federal district court. On March 11, 1992, the district court issued a preliminary injunction against Wiza prohibiting him for a period of one year

from directly or indirectly communicating with, soliciting or providing fund-raising events, projects or services for customers or clients of [JAK], defined as those customers or clients from whom [JAK] received a fee for services performed from March 24, 1988 to and including November 25, 1991.

The injunction has not been stayed, and this interlocutory appeal now follows.

## II. Discussion

JAK's complaint seeks to enforce only that portion of the covenant not to compete that directs Wiza "for a period of one (1) year after ... termination that he will not

---

**2.** In their written employment contract and throughout this litigation, the parties agreed

that Indiana law applies to the present case.

contact any client, customer or show sponsor of the Corporation." This appeal is confined to Wiza's challenge to the court's order for a preliminary injunction based on the covenant. The parties leave for trial JAK's claims for a permanent injunction, breach of contract and punitive damages, and Wiza's counterclaims for breach of contract and anti-trust violations.

When a court of appeals considers a preliminary injunction order, which should set forth the judge's reasoning under Fed.R.Civ.P. 65(d), the factual determinations are reviewed under a clearly erroneous standard and the necessary legal conclusions are given *de novo* review.... However, the ultimate evaluation and balancing of the equitable factors is a highly discretionary decision and one to which this court must give substantial deference.

*National People's Action v. Village of Wilmette*, 914 F.2d 1008, 1011 (7th Cir. 1990), *cert. denied,* — U.S. —, 111 S.Ct. 1311, 113 L.Ed.2d 245 (1991), *citing Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1437 (7th Cir.1986); *cf. United States v. Rural Elec. Convenience Coop. Co.*, 922 F.2d 429, 432 (7th Cir.1991) (citations omitted).

To support the issuance of a preliminary injunction, a plaintiff must demonstrate: 1) a reasonable likelihood of success on the merits; 2) the inadequacy of a remedy at law; 3) the existence of irreparable harm without the injunction; 4) that the threat of harm to the plaintiff outweighs any harm to the defendant if the injunction were issued; 5) that the public interest would not be disserved if the injunction were granted.

*Kellas v. Lane*, 923 F.2d 492, 493 (7th Cir.1990). *See Henderson v. Lane*, 979 F.2d 466, 467 (7th Cir.1992); *Rural Elec.*, 922 F.2d at 432; *Brunswick Corporation v. Jones*, 784 F.2d 271, 273–74 and n. 1 (7th Cir.1986).

The parties at least agree that the preliminary injunction, if issued, would not harm the public's interests. Beyond that, Wiza disputes the remaining elements required for a preliminary injunction. In ad-

dition, Wiza argues that the district court too broadly defined the scope of the enjoined activity, in particular, the enforcement time period and the court's definition of customers covered by the non-competition clause.

A. *The elements of an adequate legal remedy, irreparable injury, and the balance of harms.*

■ Wiza argues that JAK possesses an adequate remedy at law and would not suffer irreparable harm absent the injunction. As a matter of Indiana law, however, it is not necessary that JAK show irreparable harm in terms of dollars and cents. Whenever an employee uses his experience gained from an employer in violation of a reasonable covenant not to compete, irreparable injury occurs and injunctive relief is appropriate. *Peters v. Davidson, Inc.*, 172 Ind.App. 39, 359 N.E.2d 556, 561 (1977); *Welcome Wagon, Inc. v. Haschert*, 125 Ind.App. 503, 127 N.E.2d 103, 106 (1955).

The district court found that Wiza sent a letter to many of JAK's contractors referring to JAK's president John Keller as a "shark" engaged in "greedy frenzies"; Wiza had also attached to this letter a confidential employment agreement covertly removed from JAK's offices. The court also found that in the fund-raising business JAK's success depends upon a very personal relationship with its customers. Wiza does not challenge these findings, nor the court's conclusion that Wiza's acts of disruption would be difficult to trace. Thus, JAK sufficiently proved the inadequacy of any legal remedy and the irreparable harm involved.

■ At the time of the preliminary injunction hearing, Wiza had contracted with five former JAK customers, although they were not under contract with JAK at the time of Wiza's termination. However, "Wiza admitted there was at least one potential customer for his (and JAK's) services in almost every town or city in America." Wiza now insists that the preliminary injunction would send him into bankruptcy. We do not connect an injunction with such dire consequences. Rather, we

agree with the district court's conclusion that

> JAK seeks only to protect its customers from solicitation, which Wiza admits is a small percentage of the potential customers in the market. Wiza has every opportunity to earn a substantial living from non-JAK customers. Thus, the calculus of harms is strongly in favor of an injunction on behalf of JAK.

In addition, Wiza's admission that his only customers involve former (or possibly current) JAK customers highlights the importance of enjoining Wiza's activities. Wiza cannot irreparably harm JAK, benefit from the harm inflicted, and then expect protection in a court of equity. *Peters, supra.*

**B. The sufficient likelihood of success on the merits.**

Wiza argues that JAK failed to prove that the covenant not to compete was ancillary to the main purpose of the parties' agreement as required by Indiana law. He also claims that JAK cannot selectively enforce a part of the covenant, and that the district court too broadly defined "client, customer, or show sponsor."

### 1. Whether the covenant was ancillary.

 Indiana disfavors covenants not to compete. The courts will not enforce a covenant when it unreasonably restrains trade. *See Milgram v. Milgram,* 105 Ind. App. 57, 12 N.E.2d 394, 395 (1938). Thus, the court will grant injunctive relief only where the covenants not to compete are:

> (a) reasonably necessary for the protection of the employer's business; (b) not unreasonably restrictive of the employee's rights; and (c) not against public policy.

*Peters v. Davidson, Inc.,* 172 Ind.App. 39, 359 N.E.2d 556, 560 (1977); *see Grand Union Tea Company v. Walker,* 208 Ind. 245, 195 N.E. 277, 280 (1935). Whether the covenant contains reasonable restrictions depends upon the geographic area, time, and scope of professional activity or conduct involved. *Young v. Van Zandt,* 449 N.E.2d 300, 304 (Ind.App.1983). In addition, case law requires that the covenant

not to compete be "ancillary to the main thrust of the contract." *Woodward Ins., Inc. v. White,* 437 N.E.2d 59, 66 (Ind.1982). A restraining covenant must be "merely ancillary to the main purpose of a lawful contract, and necessary to protect the covenant in the enjoyment of the legitimate fruits of the contract, or to protect him from the dangers of an unjust use of those fruits by the other party." *Milgram,* 12 N.E.2d at 395. "Ancillary", when used in this context, connotes an auxiliary, secondary, or supplemental, as compared to the primary, purpose of the contract. *Black's Law Dictionary* 85 (6th ed. 1990). Although a covenant not to compete may contain reasonable restrictions, it should not stand alone. The Indiana courts have asserted that the covenant cannot be the main object of the parties' agreement, but must be ancillary.

Although the courts have historically taken this position, they have not indicated exactly why. Presumably when a covenant is merely part of a larger employment agreement, its relatively diminished stature reduces the likelihood of abuse where it simply eliminates a competitor. The larger agreement establishes consideration and mutual benefit; the covenant, then, becomes the employer's benefit in exchange for an employee benefit set out in other parts of the agreement.

██ A covenant not to compete commonly seeks to protect an employer who shares information, usually confidential, with an employee. If that employee quits and uses that information to profit at the former employer's expense, courts will enforce the covenant's provisions. *See Business Records Corp. v. Lueth,* 981 F.2d 957, 960–961 (7th Cir.1992) (applying Illinois law and enforcing a restrictive covenant not to compete involving a purchaser, rather than an employer). The courts peruse the overall agreement for a balance between the employer's need to protect its own business interests and the former employee's need to be free from unwarranted competitive restraints. If the employer seeks a covenant not to compete solely to restrain competition, it will be struck down because "it

tends to a monopoly." *Milgram*, 12 N.E.2d at 395, *citing Horner v. Graves*, 7 Bing. 735, 131 Eng.Rep. 284 (1831). Rather, the restraint must anticipate a possible injury the employer would suffer at the hands of a former employee, as opposed to merely preventing an employee from competing in the future. The relatively recent case of *Field v. Alexander & Alexander of Ind., Inc.*, 503 N.E.2d 627, 632 (Ind.App.1987), illustrates the distinction.

■ Because of his past sales performance, Field had been offered an option to purchase stock by participating in a Long Term Capital Accumulation Program ("LTCAP"). But the offer required him to sign a non-competition agreement. *Id.* at 630–31. After concluding that there was valid consideration, the court addressed Field's challenge that the covenant was not ancillary. The court applied the *Woodward* test which required that the "covenant and contract have a significant nexus to the 'employment situation.'" *Id.* at 632. If so, it would render the covenant ancillary as it would be "necessary to protect legitimate rights of the employer" even though those protected rights may not have been set out in the contract to which the covenant was attached. *Id.* Under this test, the court held that the covenant not to compete was ancillary to the LTCAP, adopting the trial court's finding that the LTCAP's main purpose was to

> include key employees in an incentive program in order to influence their future performance by giving them an interest in the profits of the company. And as such, the covenants not to compete are related to the employment relationship between the Plaintiff and Defendant.

*Id.* Thus, the *Field* court enforced a reasonable restrictive covenant not to compete where it was a secondary part of a more comprehensive employment relationship. To ascertain the requisite balance under an employment relationship, the courts engage in a case-by-case examination of the pertinent facts. *See, e.g., Buanno v. Weinraub*, 226 Ind. 557, 81 N.E.2d 600 (1948), and *4408, Inc. v. Losure*, 175 Ind.App. 658,

373 N.E.2d 899, 903 (1978), enforcing covenants not to compete. *Cf., Ohio Valley Comm. v. Greenwell*, 555 N.E.2d 525, 529 (Ind.App.1990) (affirming the trial court's refusal to enforce a covenant not to compete because "the court did not find that the covenant was ancillary to the compensation agreement").

■ The district court made no express finding that the covenant not to compete was ancillary to the main purpose of the agreement. The covenant was part of a document signed by the parties approximately one month after Wiza began working for JAK. Wiza argues that the contract made no changes in Wiza's compensation or job responsibilities, but was merely a recitation of what was already in place. Thus, if JAK and Wiza made an oral agreement which they later reduced to writing, any additional provisions in the writing, such as a covenant not to compete, might fail for want of consideration. Wiza seems to argue that the covenant was not ancillary because of inadequate consideration. However, Wiza's attempt to isolate the written contract that he signed from the entire circumstances of his employment situation was specifically rejected in *Woodward*, 437 N.E.2d at 66. If the written contract is supported by adequate consideration, as the district court so found and which Wiza does not challenge, the covenant not to compete is analyzed in the context of Wiza's employment situation, which includes both the oral and written contracts. *Field*, 503 N.E.2d at 632; *Woodward*, 437 N.E.2d at 66; *Buanno v. Weinraub*, 226 Ind. 557, 81 N.E.2d 600, 603 (1948).

The written agreement included the following: a statement that Wiza's title would be "Regional Sales and Marketing Representative"; a summary description of Wiza's employment responsibilities; the stated intention that JAK would relocate from Muncie, Indiana to the southern part of the United States, and that Wiza agreed to the move; Wiza's compensation and work hours; a "best efforts" provision; the effect on Wiza's territory should additional marketing agents be hired; and a covenant not to compete. Thus the con-

tract covered a broad range of topics. JAK agreed to provide resources to Wiza in pursuit of ordinary business objectives. For example, Wiza does not challenge the district court's findings that in the police association fund-raising business, the personal relationship between the customer and fund raiser is a major key to success. And Wiza only knew of JAK's customers by virtue of his employment relationship. Any restraint of Wiza's future use of such resources against JAK's business interests was proper by necessity. *See Field,* 503 N.E.2d at 632. The main thrust of Wiza's employment contract was his relationship with JAK while being employed, not to later restrain competition. *See Milgram,* 12 N.E.2d at 395. Therefore, the covenant not to compete was ancillary to the main purpose of Wiza's employment situation.

### 2. The "blue pencil" doctrine.

■ The blue pencil doctrine holds that if a contractual covenant contains both reasonable and unreasonable restrictions, excessive or unreasonable portions may be disregarded or severed from the remainder and the reasonable restrictions may be enforced. *See Black's Law Dictionary* 173 (6th ed. 1990). In Indiana, the blue pencil doctrine applies to a covenant not to compete that is severable in its terms. *Young v. Van Zandt,* 449 N.E.2d 300, 304 (Ind. App.1983). Simply put, unreasonable restraints are rendered reasonable by scratching out any offensive clauses. This strives to give effect to the parties' intentions, if practicable. *Seach v. Richards, Dieterle & Co.,* 439 N.E.2d 208, 215 (Ind. App.1982).

Wiza agreed in the covenant not to compete that for a period of one year after leaving "he will not contact any client, customer or show sponsor of the Corporation, telephone managers or solicitors or sales personnel, nor shall he disclose any methods, training techniques or sales material, or other information of the Corporation." The district court enforced only part of the covenant. The court did not enforce, nor did JAK ask the court to enforce, that portion of the covenant that prevented Wiza from contacting any "telephone man-

agers or solicitors or sales personnel." Wiza argues that the district court erred in making a wholesale redaction of the overbroad covenant. But even if overbroad, reasonable provisions in the covenant may be enforced.

If the covenant is not reasonable as written, the court may not create a reasonable restriction under the guise of interpretation, since this would subject the parties to an agreement they had not made. However, if the covenant is clearly separated into parts and some parts are reasonable and others are not, the contract may be held divisible. The reasonable restrictions may then be enforced.

*Young v. Van Zandt,* 449 N.E.2d at 304.

If a covenant not to compete contains unreasonable provisions, the key inquiry is whether the unreasonable language "may be stricken in order to remedy this deficiency." *Id.* at 306 (holding the covenant incapable of redaction and thus unenforceable). In *Seach v. Richards, Dieterle & Co., supra,* an employee had covenanted not to compete with any present, past or prospective client of the employer. The court concluded that the past and future restrictions were too broad and vague, but enforced the restrictions against the employer's present clients. "Although the words 'present, past or prospective' client appear throughout the non-competition clause, we can enforce the acceptable portion of that phrase which applies to present clients of the Firm as they are a protectable interest." *Id.* at 215. *Accord Licocci v. Cardinal Associates, Inc.,* 445 N.E.2d 556, 561 (Ind.1983); *Welcome Wagon,* 127 N.E.2d at 106. In the present case even if the restrictions against the telephone managers, solicitors or sales personnel were unreasonable, the court could properly disregard that portion of the covenant and enforce the reasonable restrictions regarding JAK's clients, customers or show sponsors.

### 3. The definition of clients and customers.

■ Next Wiza argues that the district court created new terms under the guise of

interpretation. The court interpreted the words "he will not contact" as prohibiting Wiza "from directly or indirectly communicating with, soliciting or providing fundraising events, projects or services for customers or clients of [JAK]." The court interpreted the words "client, customer or show sponsor" as "those customers or clients from whom [JAK] received a fee for services performed from March 24, 1988 to and including November 25, 1991." [3] Wiza is correct that the words used in the district court's injunction order are different from those words used in the covenant not to compete. However, if anything, the district court more narrowly defined the proscribed activity. To "contact" can certainly include more than "directly or indirectly communicating with" someone. "Client" and "customer" can certainly include more than those that had received a fee during a limited period of time. As a matter of contract interpretation, the court has a duty to ascertain the intent of the parties by examining the plain meaning of the contract. *See First Fed. Sav. Bank v. Key Markets*, 559 N.E.2d 600, 603–04 (Ind. 1990). We see no barrier under Indiana law that a contract which prevents the greater cannot be read to include the lesser. Wiza has not cited authority that to "contact" cannot include to "directly or indirectly" communicate. Wiza's more convincing argument concerns whether the district court's definitions are reasonable restrictions on Wiza's future employment activities.

In *Hahn v. Drees, Perugini & Co.*, 581 N.E.2d 457, 459 (Ind.App.1991), the employees signed a covenant "not to perform any work ... for any client of the employer." The contract defined a client to include any firm that had received a fee within three years of the employee's termination. After using the blue pencil doctrine to redact any

reference to past clients from the covenant, the court held that the phrase:

> A client shall be any individual, firm, or credit union from whom the employer has received a fee for services performed from the date of the employee's employment thru and including the date of the employee's termination—is an enforceable restriction against dealing with [the employer's] "present" clients.

*Hahn*, 581 N.E.2d at 462. Unlike *Hahn*, however, the present contract does not contain any comparable definition of "client". For our purposes, the importance of *Hahn* is that the court adopted a presumption that a covenant restraining employees from doing business with their ex-employer's past customers is unreasonable. *Id.* at 461. *Accord Donahue v. Permacel Tape Corporation*, 234 Ind. 398, 127 N.E.2d 235, 239 (1955); *Seach*, 439 N.E.2d at 213–14.

In *Field*, the covenant not to compete stated, in pertinent part, that the employee would not, after termination,

> directly or indirectly ... accept or receive insurance ... business, from, or to, any customer or active prospect of the Corporation, ... which you personally ... handled, serviced or solicited at any time during the two year period immediately preceding termination of your employment.

503 N.E.2d at 629. Field argued that the phrase "any customer" was susceptible of two interpretations:

> [1] [T]he covenant could be read to include only customers whom Field personally serviced or solicited during the two years prior to his termination [and] who were still customers at the time of his termination; or [2] ... anyone Field contacted in the two years regardless of their current business relationship with Alexander.

---

**3.** Wiza cites the prior, unpublished opinion of *JAK Productions, Inc. v. Woolery*, No. IP 89–1049–C (S.D.Ind.1989), as preclusive on the definition of "contact" in the covenant. In *Woolery*, JAK attempted to enforce the same covenant not to compete as in the present case. The district court refused to enter the preliminary injunction. In so doing the court defined "the word 'contact' as requiring initiation by Wool-

ery of communications with listed individuals." *Woolery* was not published and thus is limited to the law of that case. But even assuming that the *Woolery* case applies, the definition of "contact" does not conflict with or preclude the definition by the district court in the present case. The remainder of the *Woolery* court's conclusions dealt with portions of the covenant not directly at issue here.

*Id.* at 634. The Court held that "'any customer' in the covenant does not fairly admit of the second interpretation." *Id.* Like *Field*, the covenant not to compete in the present case becomes effective "in the event of the termination of this agreement," and contains no explicit reference to a distinction between past and present customers. Unlike *Field*, where the employee covenanted not to compete with customers which he had "personally ... handled, serviced or solicited," in the present case Wiza agreed not to "contact any client, customer or show sponsor." Such a factual distinction is not material. The *Field* court presumed that "any customer", in the absence of explicit language to the contrary, should be confined to the employer's customers at the time of the employee's termination. *Id.* And this rule applies here as well.

Whether a customer is a past or present one is fact-sensitive and depends on the nature of the business. *Hahn*, 581 N.E.2d at 460–61. In the present case, JAK agrees to solicit charitable contributions for law enforcement associations under multi-year contracts, perhaps up to five years in length. At the preliminary injunction hearing, JAK presented evidence that its customers could, and often do, cancel their contract after one year as a means of renegotiation. This implies a customer could cancel its contract yet remain a customer in the sense that the parties could, and often do, arrange for better terms. From the general implications of JAK's proof at the hearing, the district court concluded that "All customers with whom JAK held contracts during Wiza's employment from March 24, 1988, through November 25, 1991, are properly classified as protectable customers" based on the finding that "The cancellation of a contract does not mean the end of a relationship, but is often just a prelude to contract negotiation." In this the court erred. Although, according to the nature of this business, a signed contract is not necessary to constitute cus-

tomer status, JAK presented no evidence that all of its customers that paid a fee as far back as 1988 continued as customers in 1991.

Given the presumption under Indiana law that a covenant cannot restrain employees from doing business with their ex-employer's past customers, *Hahn*, 581 N.E.2d at 461, *Seach*, 439 N.E.2d at 213–14, and the presumption that a covenant restraining business with customers concerns only those customers at the time of the employee's termination, *Field*, 503 N.E.2d at 634, the district court's definition of customer and client is too broad. We modify the injunction accordingly, by striking the court's definition of protectable customers and substituting "those customers or clients who had an ongoing business relationship with JAK as of November 25, 1991, whether or not a contract with JAK was then in force." [4]

## C. *Unclean hands.*

Wiza argues that the evidence at the preliminary injunction hearing established that JAK was not merely interested in protecting his present customers from Wiza's solicitations, but that JAK had taken a "vow to destroy Wiza." Wiza also cites to the unpublished opinion in *JAK Productions, Inc. v. Woolery*, No. IP 89–1049–C (S.D.Ind. Jan. 16, 1990), as demonstrating a pattern of JAK's vindictive behavior. The evidence at the preliminary injunction hearing does not support Wiza's arguments. Based on a review of the transcript, we cannot conclude that the district court clearly erred in finding that "The evidence presented failed to show that JAK has 'unclean hands.'" To the contrary, we leave such credibility determinations to the district court's discretion.

## D. *The enforcement time period.*

Wiza terminated his employment on November 25, 1991. The covenant not

---

**4.** We note that because of the length of the district court and circuit court proceedings, our decision in this matter will not have affected the district court's injunction. Whether the district court's injunction caused Wiza to not compete

with customers that are not covered by the injunction as now modified can be considered in the context of the $20,000.00 bond posted by JAK.

to compete stated that "for a period of one (1) year after such termination that he will not contact any client, customer or show sponsor." On March 11, 1992, the district court enjoined Wiza from competing with JAK's customers and clients for a period of one year from the injunction date. Wiza argues that the preliminary injunction should have expired no later than November 25, 1992, in accordance with the underlying covenant. JAK responds that special or extenuating circumstances allowed the district court the discretion to enjoin Wiza's activities until March 11, 1993.

Although Indiana disfavors covenants not to compete as restraints of trade, we have concluded that the covenant is reasonably necessary to protect JAK's business, that it does not unreasonably restrict Wiza and that it comports with Indiana law and public policy. The scope of the injunction should be limited by the terms in the covenant. *Peters*, 359 N.E.2d at 560; *Bob Layne Contractor, Inc. v. Buennagel*, 158 Ind.App. 43, 301 N.E.2d 671, 680 (1973); *Lawrence v. Cain*, 144 Ind.App. 210, 245 N.E.2d 663, 667 (1969). "Where there are no special or extenuating circumstances, injunctive relief beyond the terms of the restrictive covenant of an employment contract is not a proper remedy." *F.W. Means & Co. v. Carstens*, 428 N.E.2d 251, 261 (Ind.App.1982). We agree with Wiza that the district court did not make a specific finding of fact that special or extenuating circumstances existed; however, the court did find that "Since at least November 25, 1991, Wiza has been in competition with JAK, and has contacted JAK's customers in violation of the Agreement." And the court concluded that "the non-competition provision at issue in the Agreement is for a period of one year. This is reasonable and enforceable under Indiana law."

To illustrate the timeliness of his actions, Wiza states that he did not begin solicitations until January 2, 1992, and the preliminary injunction hearing occurred only one month later. We disregard this statement, however, because it conflicts with a specific finding by the district court, which on the record is not clearly erroneous. The parties do not dispute that this action began on December 11, 1991, when JAK filed its complaint in a Delaware, County, Indiana Superior Court. Wiza thereafter obtained a change of venue to the Blackford County, Indiana Circuit Court. On January 30, 1992, Wiza removed the case to the federal district court. Within a few days, on February 4, 1992, the district court conducted the preliminary injunction hearing and issued its ruling on March 11, 1992. In light of this timetable, this case involves neither an unreasonable delay by the parties nor the district court; thus, the parties' dispute concerning the *Carstens* restriction of going beyond the terms of the covenant does not apply. 428 N.E.2d at 261 and n. 18.

Wiza is correct in that the district court did not reach the issue of whether special or extenuating circumstances existed. But the district court did not need to find special circumstances to uphold the terms of the restrictive covenant. Wiza agreed to not compete with JAK's customers and clients "for a period of one (1) year after such termination." This language can be divided into two parts: First, Wiza agreed not to compete for a period of one year. Second, Wiza agreed not to compete beginning immediately after his termination. A violation of the second part should not narrow the agreement as to the first. The covenant does not demand an interpretation that Wiza is free to compete with JAK one year after termination. Although the district court's opinion does not supply step-by-step reasoning on this issue, the record does support a reasonable analysis: because Wiza violated the covenant not to compete from November 25, 1991 until the injunction, and the covenant requires Wiza to refrain from such competition for a period of one year, the district court did not err in determining the period of one year as March 11, 1992 to March 11, 1993. To hold otherwise would reduce the covenant from twelve to eight months, where neither the district court nor JAK contributed to any delay.

### III. Conclusion

We reject Wiza's arguments that his actions left JAK with an adequate legal rem-

edy, that absent the injunction JAK would not suffer irreparable harm, and that the balance of harms favors Wiza. JAK proved a sufficient likelihood of success on the merits, and the district court properly determined that the injunction period last until March 11, 1993. We modify the injunction by revising the definition of "customers" to include those who had an ongoing business relationship with JAK as of November 25, 1991, whether or not a contract with JAK was then in force. As modified, the district court is AFFIRMED, and the case is remanded for further proceedings.