James Alexander TANFORD, Kimberly J. MacDonald, and David Suess, Plaintiffs,

v.

Dr. Myles BRAND, in his individual and official capacities as President of Indiana University, and Dr. Kenneth R.R. Gros Louis, in his official capacities as Vice President and Chancellor of Indiana University at Bloomington, Defendants.

No. IP 95–492 C B/S.

United States District Court, S.D. Indiana, Indianapolis Division.

May 4, 1995.

---

Richard A. Waples, Cheri A. Harris, Indiana Civ. Liberties Union, Indianapolis, IN, for plaintiffs.

Dorothy J. Frapwell, Michael A. Klein, Indiana University, Bloomington, IN, Robert P. Johnstone, Stanley C. Fickle, David E. Kirtley, Barnes & Thornburg, Indianapolis, IN, for defendants.

BARKER, Chief Judge.

Today we must answer a question explicitly left open by the Supreme Court in *Lee v. Weisman*, —— U.S. ——, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992)—namely, whether a member of the clergy may offer prayers as part of a public university's graduation ceremony consistent with the Establishment Clause of the United States Constitution. Because Plaintiffs failed to demonstrate a likelihood of their succeeding on the merits, we deny their motion for preliminary injunctive relief.

## I. FACTUAL BACKGROUND

Given the accelerated pace of this suit, the underlying facts are still somewhat underdeveloped. However, the following facts are largely undisputed. Plaintiffs James Alexander Tanford, Kimberly MacDonald and David

Suess are, respectively, a tenured law professor and two students[1] enrolled in Indiana University ("IU") law school at Bloomington, Indiana. Defendant Myles Brand is the President of the University and defendant Kenneth R.R. Gros Louis is the Vice President and Chancellor of the University's Bloomington campus. The University is a state institution.

For over 150 years, the University has invited clergy to give an invocation and a benediction as part of its official graduation ceremonies. These prayers are typically recited by ordained ministers of mainstream religious denominations, selected from religious leaders active in the university community. Usually, if not always, the prayers include a reference to a deity. During the ceremony, the cleric is introduced, and the audience is directed to stand during the prayers. The cleric, wearing university regalia (cap and gown) also sits on the dais with the University president and other University officials throughout the commencement ceremony.

The graduation ceremonies are held on University grounds. This year's university-wide ceremony is scheduled to begin at 10:00 A.M. on Saturday, May 6, in the football stadium. Based on past years' experience, the University expects approximately 30,000 people in attendance. There are 7,400 students on the Bloomington campus who are eligible for commencement. The University expects 5,000 of these graduating students to participate, along with their family and friends. Between 15% to 55% of graduating law students are expected to participate in the university-wide ceremony.

As part of the commencement activities, the School of Law conducts a second, smaller ceremony only for its graduates later in the day in the IU auditorium. At this ceremony, the University recognizes each of its graduates individually by calling their names and having them walk across the stage to receive their law degrees. Based on past experience, the law school expects 75% to 90% of graduating law students to participate. The law school ceremony does not include an invocation or benediction.

As part of their duties at the law school, professors are requested[2] from time to time and on a rotating basis to attend the university-wide ceremony in order to assist in the presentation of academic hoods to law school graduates. Although he has attended the ceremony only once during his fifteen years as a member of the IU faculty, Professor Tanford has agreed to attend this year's upcoming commencement. Neither at the university-wide commencement, nor the more intimate law school ceremony, are the two student plaintiffs subject to formal requirements to attend.

On April 18, 1995, Plaintiffs filed the instant suit seeking a preliminary injunction to enjoin the use of an invocation and benediction as part of IU's university-wide graduation ceremony. Their one count complaint alleges that IU's practice of including an invocation and benediction as part of its official graduation exercises violates the Establishment Clause of the First Amendment to the United States Constitution.

## II. STANDING

Article III of the Constitution limits the power of this court to resolving cases and controversies. The doctrine of standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). At a minimum, standing requires that the plaintiff suffer an "injury in fact" that is fairly traceable to the challenged action of the defendant and the injury is likely to be redressed by a favorable decision. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

---

1. Plaintiff MacDonald is a graduating law student while plaintiff Suess is completing his first year of law school.

2. The parties stipulate that no explicit requirement is imposed on faculty to attend the commencement ceremony and no sanction flows from a failure to volunteer for such service.

■ An "injury in fact" is an invasion of a legally-protected interest which is concrete and particularized, not conjectural or hypothetical. *Doe v. County of Montgomery,* 41 F.3d 1156, 1159 (7th Cir.1994). Significantly,

> [a] plaintiff who fails to identify any personal injury suffered as a consequence of the alleged constitutional error, "other than the psychological consequence presumably produced by observation of conduct with which one disagrees," has no standing under Article III.

*Id.* Anything more than a psychological injury, however, is generally enough to confer standing. Indeed, when First Amendment rights are implicated, "an identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation." *United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973) *quoted in Doe,* 41 F.3d at 1159.

In light of this broad language, we fear in this context that the law of standing has taken on an almost metaphysical quality. One wonders how anyone can reliably and properly determine that the meaning and significance of standing if it is satisfied by an "identifiable trifle." Yet even under such an expansive interpretation, standing poses a significant obstacle to Plaintiffs' case.

■ Plaintiff David Suess, for example, is a twenty-eight year old student currently completing his first year of law school. He is not scheduled to graduate until May of 1997. He has been invited to commencement activities by some graduating friends and feels that, *should he attend,* the invocation and benediction will make him feel uncomfortable. We emphasize the uncertainty of his attendance because Mr. Suess has not yet decided whether he will attend the university-wide commencement. When asked in a deposition whether he would attend the university-wide commencement (the subject of this lawsuit) or the smaller law school ceremony later that day (which does not include an invocation or benediction), he replied: "Definitely the law school ceremony and *quite possibly* the commencement." (Suess

Dep. at p. 32) (emphasis added). But it depends "partially on how things go with this and schedule conflicts." (*Id.* at p. 32).

From this admission, it is clear that Mr. Suess has no stake in this litigation. If he decides to stay home and miss the campus-wide ceremony, then he will simply have no "direct and unwelcome exposure to a religious message." *Doe,* 41 F.3d at 1159. If he decides to attend, he is no more than an observer with nothing at stake in the ceremony besides the "psychological consequence presumably produced by observation of conduct with which one disagrees." *Valley Forge,* 454 U.S. at 485, 102 S.Ct. at 765. Either way, Suess's alleged injury is even more theoretical than the interests found insufficient to confer standing in *Freedom From Religion Foundation, Inc. v. Zielke,* 845 F.2d 1463 (7th Cir.1988). In that case, the Seventh Circuit considered whether the plaintiffs had standing to challenge the constitutionality of a monument of the Ten Commandments in a city park. Because the plaintiffs did not alter their behavior as a result of the monument and failed to demonstrate that they were exposed to the monument during their normal routines or in the course of their usual driving or walking routes, the court affirmed the district court's dismissal for lack of standing. *Id.* at 1468–69. Thus, because Mr. Suess cannot demonstrate that he will be exposed to an unwelcome religious exercise, he lacks standing and is hereby dismissed.

■ Plaintiff James Tanford's stake, by contrast, falls squarely in the category of a "trifle," but apparently that suffices under current constitutional interpretations. As a tenured professor at the law school, Tanford states he is "obligated" to attend the university-wide commencement exercises, or at least the "hooding" portions of the ceremony, once every few years. He admits, however, that this obligation is not externally imposed in any way. Indeed, when asked by the Dean to "volunteer" for this duty in the past, Tanford has successfully avoided it; he has only attended the ceremony once in his fifteen years as a member of the law school faculty, and there has never been any threat of discipline as a result of not participating.

Nevertheless, Professor Tanford unequivocally states that he plans to attend this year. Moreover, because he is a faculty member, his connection to the ceremony and his stake in its constitutionality are more direct than the ephemeral injustice that Plaintiffs contend will allegedly be suffered by Mr. Suess, a mere observer. Thus, although his interest constitutes only a trifle, "an identifiable trifle is enough for standing." *SCRAP*, 412 U.S. at 689 n. 14, 93 S.Ct. at 2417 n. 14. We therefore permit him to remain in the suit "to fight out a question of principle." *Id.*

■ The basis for MacDonald's standing, by contrast, is on much firmer ground. Because she is currently completing her third and final year of law school, she will be graduated at this year's ceremony. Moreover, she has indicated her intention to attend. (MacDonald dep. at p. 43). Thus, MacDonald has demonstrated both a concrete stake in the constitutionality of the ceremony and also a strong likelihood of being directly exposed to an unwelcome religious exercise. Accordingly, we find that her interest in the litigation is sufficient to confer standing.

■ We emphasize, however, that MacDonald may not bootstrap her interest in the litigation from injuries that will allegedly be suffered by her two-year old daughter. MacDonald has sued strictly on her own behalf and not that of her daughter.[3]

### III. PRELIMINARY INJUNCTION STANDARD

■ In determining whether to grant preliminary injunctive relief, the Court must examine the following factors:

(1) whether Plaintiff has a reasonable likelihood of success on the merits;

(2) whether there are adequate remedies at law;

(3) whether there will be irreparable harm if an injunction does not issue;

(4) whether the balance of harms to the movant if an injunction is denied and to the opponent if the injunction is granted favors the movant; and

(5) whether an injunction is adverse to the public interest.

*JAK Productions, Inc. v. Wiza*, 986 F.2d 1080, 1084 (7th Cir.1993); *Grossbaum v. Indianapolis–Marion County Building Authority*, 870 F.Supp. 1450, 1453 (S.D.Ind. 1994). The Court, "sitting as would a chancellor in equity, then weighs" these factors in deciding whether to grant the injunction. *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir.1992).

■ Although distinct in theory, these five elements essentially reduce to a discussion of the Plaintiffs' likelihood of success on the merits in this case. Indeed, irreparable harm is presumed to flow from violation of a constitutional right: "[T]he loss of First Amendment freedoms for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976); *accord Shondel v. McDermott*, 775 F.2d 859, 866–87 (7th Cir.1985). A conclusion that an injury is irreparable in turn establishes that there is no adequate remedy at law. *Fleet Wholesale Supply v. Remington Arms Co.*, 846 F.2d 1095, 1098 (7th Cir. 1988) ("To say that the injury is *ir*reparable means that the methods of repair (remedies at law) are inadequate") (emphasis in original). Because governmental compliance with the Constitution always serves the common good, determination of the public interest also turns on the merits. *Grossbaum*, 870 F.Supp. at 1453. Finally, the balance of harms here does not tip decidedly on either side; the harms from an erroneous ruling flow equally in either direction.[4] Thus, our

---

**3.** Given the identities of the Plaintiffs, we have our doubts about whether this suit represents anything more than a clinical classroom exercise contrived by a law professor and two of his students. We therefore remind these parties, as well as all future litigants, that the machinery of the federal courts is not to be engaged merely to conduct "ingenious academic exercise[s] in the conceivable." *Lujan*, 504 U.S. at 566, 112 S.Ct.

at 2139. However, as set forth above, in this case both Professor Tanford and Plaintiff Kimberly MacDonald, who will be graduated at the challenged ceremony, have shown a likelihood of establishing a perceptible, albeit fleeting, harm.

**4.** Indeed, as Defendants concede, in weighing the relative harms, the Court must focus "on the risk of an erroneous decision." (Brief in Opposi-

decision on the preliminary injunction is based on which side appears more likely to succeed on the merits.

## IV. LIKELIHOOD OF SUCCESS ON THE MERITS

Concerning religion, the First Amendment both promises its free exercise and prohibits its establishment: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const.Amend. I. In crafting this provision of our Constitution, the Founding Fathers recognized, as must this Court, the tension between these rights. To deal with that tension they crafted their great compromise: free exercise, but no coercion.

The Supreme Court has explained that the purpose of the establishment prohibition is "to prevent, as far as possible, the intrusion of either [the church or the state] into the precincts of the other." *Lemon v. Kurtzman,* 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971). Indeed, the federal courts have often used Thomas Jefferson's metaphor of a wall of separation between church and state to emphasize "that religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State." *Lee v. Weisman,* — U.S. —, —, 112 S.Ct. 2649, 2656, 120 L.Ed.2d 467 (1992).

■ At the same time, however, we recognize that "total separation is not possible in an absolute sense. Some relationship between government and religious organizations is inevitable." *Lemon,* 403 U.S. at 614, 91 S.Ct. at 2112. Indeed, as noted earlier, the Constitution affirmatively mandates the seemingly contradictory goal that government accommodate the free exercise of religion. *See Lamb's Chapel v. Center Moriches School Dist.,* — U.S. —, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993); *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). Over forty years ago the Supreme Court held that:

When the state encourages religious instruction or cooperation with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups.

*Zorach v. Clauson,* 343 U.S. 306, 313–14, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952). Thus, in every Establishment Clause case, the Court "must reconcile the inescapable tension between the objective of preventing unnecessary intrusion of either the church or the state upon the other, and the reality that, as the Court has so often noted, total separation of the two is not possible." *Lynch,* 465 U.S. at 672, 104 S.Ct. at 1359.

### A. *Lee v. Weisman*—State Involvement + Coercion

With these principles in mind, we now turn to a consideration of recent Supreme Court precedent in the case of *Lee v. Weisman,* — U.S. —, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). There, the Supreme Court held that a prayer delivered by a clergyman at a public middle school graduation ceremony violated the Establishment Clause. In the majority opinion written by Justice Kennedy, the Court noted that two facts controlled its decision: (1) "state officials direct[ed] the performances of a formal religious exercise;" and (2) "even for those students who object[ed] to the religious exercise, their attendance and participation in the state-sponsored religious activity [were] in a fair and real sense obligatory." — U.S. at —, 112 S.Ct. at 2655.

Concerning the first controlling fact, the Court stated that the school principal's extensive involvement in deciding to have prayers at graduation, in choosing the religious participant, and in controlling the content of the prayer rendered the graduation a "state-sponsored religious exercise." — U.S. at — – —, 112 S.Ct. at 2655–58. That the

tion, p. 10); *see also Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6, 11–13 (7th Cir.1992). Whether our decision is erroneous or not is again

tied up with—though not entirely dependent upon—our examination of the merits.

school attempted to make the prayers non-sectarian was not controlling. Although such measures may lessen a prayer's divisive impact, the Constitution does "not permit school officials to assist in composing prayers as an incident to a formal exercise for their students." —— U.S. at ——, 112 S.Ct. at 2657.

As to the second dominant fact, the Court reasoned that graduation prayers constituted governmental coercion because the state "in effect required participation in a religious exercise." —— U.S. at ——, 112 S.Ct. at 2659. The majority conducted a "delicate and fact-sensitive" inquiry that identified several factors contributing to the coercive nature of the ceremony. —— U.S. at ——, 112 S.Ct. at 2661. Significantly, each factor relied at least in part on the "heightened concerns [associated] with protecting freedom of conscience from subtle coercive pressure *in the elementary and secondary public schools.*" —— U.S. at ——, 112 S.Ct. at 2658 (emphasis added).

Initially, the Court emphasized that high school students perceive the involvement of their teachers, principals and friends in a religious exercise as inducing a participation they might otherwise reject. According to the Court:

> The undeniable fact is that the school district's supervision and control of a high school graduation ceremony places public pressure, as well as peer pressure, on attending students to stand as a group or, at least, maintain respectful silence during the Invocation and Benediction.

—— U.S. at ——, 112 S.Ct. at 2658. The Court maintained that this pressure, to act, although subtle and indirect, can be as real as overt coercion to adolescents susceptible to pressure from their peers. Although the Court recognized that standing with the group or remaining silent can signify "simple respect for the views of others," —— U.S. at ——, 112 S.Ct. at 2658, it argued that adolescents are likely to view their acquiescence to the group ritual as an expression of participation:

> What matters is that, given our social conventions, a reasonable dissenter in this milieu could believe that the group exercise

signified her own participation or approval of it.

—— U.S. at ——, 112 S.Ct. at 2658. Thus, in the environment of a middle school (and presumably a high school) graduation ceremony, there is a dual risk: the risk that a reasonable dissenter would feel compelled to conform her behavior to that of the other participants, and the concomitant risk that the adolescent dissenter would interpret her conformity as manifesting an approval of or participation in the group exercise.

Because reasonable dissenters could believe that the act of standing or remaining silent signifies participation, they would be placed "in the dilemma of participating, with all that implies, or protesting." —— U.S. at ——, 112 S.Ct. at 2658. The Court reasoned, however, that the force of peer pressure made protest unlikely. To be sure, attendance at the ceremony was not required. Thus, dissenting students could try to avoid the dilemma altogether by not attending the graduation ceremony. The Court, however, found that this did not excuse any inducement or coercion in the ceremony itself:

> [T]o say a teenage student has a real choice not to attend her high school graduation is formalistic in the extreme.... Everyone knows that in our society and in our culture high school graduation is one of life's most significant occasions.

—— U.S. at ——, 112 S.Ct. at 2659. Thus, even though not required, attendance is not voluntary "in any real sense ... for absence would require forfeiture of those intangible benefits which have motivated the student through youth and all her high school years." —— U.S. at ——, 112 S.Ct. at 2659.

At a minimum, then, the *Lee* majority held that "the Constitution guarantees that government may not coerce anyone to support or participate in religion." —— U.S. at ——, 112 S.Ct. at 2655. To be sure, the majority's conception of what constitutes coercion was broad; coercion derives not from any formal requirement conditioning the receipt of a diploma on attendance at the ceremony, but from the state's apparently more subtle attempt "to exact religious conformity from a student as the price of attending her own

high school graduation." —— U.S. at ——, 112 S.Ct. at 2660.

The Court specifically avoided deciding the issue presented in this case; namely, whether adults at a university commencement who object would also feel compelled to participate:

> We do not address whether [the dilemma of conforming or protesting] is acceptable if the affected citizens are mature adults, but we think the State may not, consistent with the Establishment Clause, place *primary and secondary school children* in this position.

—— U.S. at ——––——, 112 S.Ct. at 2658–59 (emphasis added). Nevertheless, a careful reading of *Lee* yields no constitutional impediments to the ceremony at issue in this case.

### (1). State Involvement

■ The first prong of *Lee* requires that there be sufficient state involvement in the graduation ceremony to render it a "state-sponsored religious exercise." That requirement was satisfied in *Lee* because the school principal had decided to include prayers in the ceremony, chosen the religious participant, and influenced the content of the prayer. Based upon the record as it now exists, we think that this case is indistinguishable from *Lee* on this point.

Above all, a graduation ceremony is a university-controlled event. University officials pick the date, time and locations for the various ceremonies. They control the content and order of events. They also decide whether the ceremony will include an invocation and benediction:

> [T]his is a choice attributable to the State, and from a constitutional perspective it is as if a state statute decreed that the prayers must occur.

—— U.S. at ——, 112 S.Ct. at 2655; *see* Dep. of Shoshana Watkins, at pp. 7–8. Moreover, a university official chooses the religious participant. This year the invited clergyman is the Reverend Robert W. Sims, a priest with St. Paul's Catholic Center. (Bolyard Aff. ¶ 8). Finally, a university official sets parameters on the prayer's content. Typically, these parameters involve a simple reminder to the clergyperson to recognize that the audience will be diverse and to make his or her remarks "unifying and uplifting for all." (Watkins Dep., at p. 13). Thus, "[g]iven that graduation is ultimately a school-controlled, school-sponsored event, there appears in this case to be just as much state involvement as appeared in" *Lee*. *Harris v. Joint School Dist. No. 241*, 41 F.3d 447, 454 (9th Cir.1994).

### (2). Coercion

■ The second prong of *Lee* requires a showing of coercion. As discussed above, Justice Kennedy's explication of what constitutes coercion was broad, recognizing that state action can have coercive effects even when it does not involve formal demands or formal sanctions. Yet even under this expanded view, we think that in this respect it is unlikely that Plaintiffs will prevail on the merits.

Undeniably, the plaintiffs here—unlike the junior and high school students in *Lee*—are mature adults who have either earned or are in the process of earning postgraduate degrees—law degrees, no less! Professor Tanford, for example, is forty-five years old and a tenured law professor. Kimberly MacDonald is twenty-four years old and is about to complete her third and final year of law school. Each has chosen a discipline where a central and valued skill is the ability to think independently and listen critically. Each is trained to analyze arguments skeptically and not to be subtly coerced by pressure, peer or otherwise. It is difficult to imagine a more rigorous discipline in these respects than that imparted (or attempted to be imparted and implanted) in legal education. Indeed, it is a lawyer's stock and trade.

Thus, unlike the adolescent plaintiffs in *Lee,* the Plaintiffs here are simply not the type of impressionable youth who deserve the special protection of the federal courts. Each has well-developed personal and religious identities. On an objective basis, the Court can and does conclude that they will not be easily pressured into conforming their actions to those of the other participants. Nor is protest an unrealistic alternative for

them.[5] Thus, the "dilemma of participating ... or protesting" never materializes. —— U.S. at ——, 112 S.Ct. at 2658.

Nor are the well-defined identities of these plaintiffs different in kind from the experiential development of college students in general. University graduates are purposefully exposed to a wider variety of ideas and beliefs than primary and secondary school students. It is part and parcel of what it means to be educated. Many of these competing ideas, beliefs and value systems, "they find distasteful or immoral or absurd or all of these." *Lee*, —— U.S. at ——, 112 S.Ct. at 2657.[6] In many significant ways, the very mission of higher education is to challenge basic values instilled during childhood at a time when the individual student has the intellectual maturity to choose between competing beliefs.[7]

Thus, the special solicitude for younger students traditionally shown by federal courts is not required here:

> There is substance to the contention that college students are less impressionable and less susceptible to religious indoctrination. Common observation would seem to support that view.... The skepticism of the college student is not an inconsiderable barrier to any attempt or tendency to subvert the ... limitations [prohibiting religious instruction]. Furthermore, by their very nature, college and postgraduate courses tend to limit the opportunities for

5. Indeed, both Professor Tanford and Ms. Mac-Donald have shown the ability to voice dissent in such matters in the past. For example, the last time Professor Tanford attended the university-wide ceremony, he absented himself from the ceremony when the invocation began, returned for the middle part, and left again before the closing benediction. Ms. MacDonald attended a prior ceremony but remained seated during these portions.

6. The Supreme Court has stated that exposure to competing value systems is essential to our system of self-government:
 The [college] classroom is peculiarly the "marketplace of ideas." The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth "out of a multitude of tongues, [rather] than through any kind of authoritative selection."

sectarian influences by virtue of their own internal disciplines.

*Tilton v. Richardson,* 403 U.S. 672, 686, 91 S.Ct. 2091, 2099, 29 L.Ed.2d 790 (1971); *see also Edwards v. Aguillard,* 482 U.S. 578, 583–84, 107 S.Ct. 2573, 2577–78, 96 L.Ed.2d 510 (1987) (noting that because children in public schools are highly impressionable, schools must be careful about sending any religious message); *Grand Rapids School Dist. v. Ball,* 473 U.S. 373, 383, 105 S.Ct. 3216, 3222, 87 L.Ed.2d 267 (1985) ("the government's activities in this area [of religion in public schools] can have a magnified impact on impressionable young minds"); *Widmar v. Vincent,* 454 U.S. 263, 274 n. 14, 102 S.Ct. 269, 276–77 n. 14, 70 L.Ed.2d 440 (1981) (university students are young adults and "are less impressionable than younger students").

The atmosphere of a university graduation is also different from that of a high school graduation. At a high school graduation:

> teachers and principals must and do retain a high degree of control over the precise contents of the program, the speeches, the timing, the movements, the dress, and the decorum of the students. In this atmosphere the state-imposed character of an invocation and benediction by clergy selected by the school combine to make the prayer a state-sanctioned religious exercise in which the student was left with no alternative but to submit.

*Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967) (citation omitted).

7. Courts and commentators have generally described primary and secondary schools as playing a different role from higher education:
 The central fact in the distinction between higher and lower education is the role of value inculcation in the teaching process. The public schools in the United States traditionally have viewed instilling the young with societal values as a significant part of the schools educational mission. Such a mission is directly opposed to the vision of education that underlies the premises of academic freedom in higher education.
 Goldstein, The Asserted Constitutional Right of Public School Teachers to Determine What They Teach, 124 U.Pa.L.R. 1293, 1342–43 (1976).

*Lee*, —— U.S. at ——, 112 S.Ct. at 2660 (citations omitted). In other words, the ceremony is highly controlled and "analogous to the classroom setting, where [the Court has] said the risk of compulsion is especially high." *Id.*

IU's graduation, by contrast, has a much less formal setting. At the university-wide ceremony, there will be 5,000 graduates and 30,000 spectators in a football stadium. People from all manner of backgrounds, races and religious creeds (including no religious creed) will attend. The ceremony, both by its size and program content, is impersonal. Students are graduated en masse from their particular school with only a few receiving individual recognition. Thousands of graduates do not attend. In a large stadium filled with thousands of graduates, a nonadherent could dissent without being noticed and without fear of being identified as a nonconformist. Nor will individual acts of standing or remaining silent necessarily be construed as expressing a position on the theological merit of certain values or of religious beliefs in general.

Moreover, IU's commencement exercises actually involve multiple graduation ceremonies. Thus, Plaintiffs have meaningful alternatives. Indeed, they can attend the admittedly more intimate law school ceremony. That ceremony does not contain an invocation or benediction, but does allow for "individual and personalized recognition" of each students' achievement in earning a degree. (Dep. of Leonard Fromm, at p. 18). Perhaps for this reason, 75% to 90% of law students attend this ceremony.

 Using language from *Lee*, Plaintiffs argue in response that the University's inclusion of an invocation and benediction "forces [them] to choose between participating in prayers that they find offensive" or missing the graduation ceremony. (Brief in Support, p. 4). However, as Justice Kennedy expressly stated in *Lee*:

We do not hold that every state action implicating religion is invalid if one or a few citizens find it offensive. People may take offense at all manner of religious as well as nonreligious messages, but offense alone does not in every case show a violation.

*Lee*, —— U.S. at ——, 112 S.Ct. at 2661. Therefore, Plaintiffs must provide more than a simple allegation that a nonadherent feels awkwardness during a religious exercise. There needs to be an additional showing that the state's involvement in the religious exercise is likely to induce an observer's reluctant participation, or to make dissent an unlikely alternative, or to influence the development of an unformed religious identity, or all of the above. Given the advanced mental and social abilities of these plaintiffs, however, as explained above, there is no such risk here.

In sum, the "symbolism of a union between church and state is most likely to influence children of tender years, whose experience is limited and whose beliefs consequently are the function of environment as much as free and voluntary choice." *Grand Rapids School Dist. v. Ball*, 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985).[8] Since these concerns are not present at a university commencement involving thousands of graduates, multiple ceremonies, advanced degrees and well-defined personal and religious identities, we find that Plaintiffs are unlikely to prevail on the merits under *Lee v. Weisman*.

### B. The *Lemon* Test—Its Application, If Any.

For two decades prior to *Lee*, the Supreme Court applied the now much maligned *Lemon* test to Establishment Clause cases. *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Reliance on *Lemon* for determination of Establishment Clause violations, however, has noticeably declined in the last decade. At least three of the Supreme Court's most recent decisions have either ignored *Lemon* or openly dispar-

8. *See also Brandon v. Bd. of Education*, 635 F.2d 971, 978 (2d Cir.1980) ("Our nation's elementary and secondary schools play a unique role in transferring basic and fundamental values to our youth. To an impressionable student, even the mere appearance of secular involvement in religious activities might indicate that the state has placed its imprimatur on a particular religious creed. This symbolic inference is too dangerous to permit").

aged it. *See Board of Education of Kiryas Joel Village School Dist. v. Grumet,* — U.S. —, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994); *Zobrest v. Catalina Foothills School Dist.,* — U.S. —, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993); *Lee,* — U.S. at —, 112 S.Ct. 2649. And over the years, at least five currently sitting Justices have called for the elimination of *Lemon* as a general purpose test for all Establishment Clause cases. *See Lamb's Chapel v. Center Moriches School Dist.,* — U.S. —, —, 113 S.Ct. 2141, 2150, 124 L.Ed.2d 352 (1993) (listing cases) (Scalia, J., dissenting). *Lee* itself expressly sidestepped the issue, stating that the constitutionality of the religious activity in that case could be judged without reference to *Lemon.* — U.S. at —, 112 S.Ct. at 2655.

Most likely, *Lemon's* unitary test will some day be replaced by a series of category-specific rules. *See Grumet,* — U.S. at —–—, 114 S.Ct. at 2499–2500 (O'Connor, J., concurring). Presumably, under such an approach, future cases involving official public occasions with religious components will be governed by *Lee v. Weisman.* Indeed, because "*Lemon* was not devised to identify prayer smuggled into civic exercises," this Court is similarly "not disposed to resolve this case by parsing *Lemon.*" *Sherman v. Community Consol. School Dist. 21,* 980 F.2d 437, 445 (7th Cir.1992).

▮ We emphasize, however, that a district court's role is not that of prophet, but rather that of disciple. We are bound by existing precedents, even when they are ambiguous and contradictory and difficult to divine. Since *Lee v. Weisman,* several Seventh Circuit decisions have addressed the question of *Lemon's* viability and have concluded that it remains the governing test in Establishment Clause cases absent any express overruling by the Supreme Court. *See Carter v. Peters,* 26 F.3d 697 (7th Cir.1994); *Fleischfresser v. Directors of School Dist. 200,* 15 F.3d 680, 686 (7th Cir.1994); *Sherman v. Community Consol. School Dist. 21*

of *Wheeling Tp.,* 8 F.3d 1160, 1164 n. 9 (7th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 2109, 128 L.Ed.2d 669 (1994); *Cohen v. City of Des Plaines,* 8 F.3d 484 (7th Cir. 1993), *cert. denied,* — U.S. —, 114 S.Ct. 2741, 129 L.Ed.2d 861 (1994); *Gonzales v. North Tp. of Lake County, Ind.,* 4 F.3d 1412, 1418 (7th Cir.1993); *Berger by Berger v. Rensselaer Cent. School Corp.,* 982 F.2d 1160, 1162 (7th Cir.1993), *cert. denied,* — U.S. —, 113 S.Ct. 2344, 124 L.Ed.2d 254 (1993); *see also Lamb's Chapel v. Center Moriches Union Free School Dist.,* — U.S. —, —, n. 7, 113 S.Ct. 2141, 2148 n. 7, 124 L.Ed.2d 352 (1993) ("*Lemon,* however frightening it might be to some, has not been overruled."). Moreover, of the two circuit courts to visit the issue of commencement prayers since *Lee,* both have applied *Lemon. See Harris v. Joint School Dist. No. 241,* 41 F.3d 447 (9th Cir.1994); *Jones v. Clear Creek Indep. School Dist.,* 977 F.2d 963, 967 (5th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 2950, 124 L.Ed.2d 697 (1993). Thus, being faithful to our charge, we now turn to *Lemon* for whatever guidance it must provide.

▮ In *Lemon,* the Supreme Court set forth a three-part test for determining the constitutionality of state action challenged under the Establishment Clause. First, the state action must have a secular purpose. Second, its primary purpose must neither advance nor inhibit religion. Third, the state action must not produce excessive government entanglement with religion. *Id.* 403 U.S. at 612–13, 91 S.Ct. at 2111. The first two criteria require that the government remain neutral[9] with respect to religion:

> The purpose prong of the *Lemon* test asks whether government's actual purpose is to endorse or disapprove of religion. The effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval. An affirma-

---

**9.** In that very terminology lies one of the most vexing analytical and application problems with the *Lemon* test, of course. Government neutrality turns out to be illusory—a posture almost impossible to establish and maintain. It is a rare act or event or practice that does not pull one

either toward or away favoring or disfavoring, advancing or inhibiting, the "religious" purpose. And *Lemon's* mandate to remain neutral and reach equilibrium inevitably entails the pendulum's movement in one direction or the other.

tive answer to either question should render the challenged practice invalid.

*Wallace v. Jaffree,* 472 U.S. 38, 56 n. 42, 105 S.Ct. 2479, 2490 n. 42, 86 L.Ed.2d 29 (1985) (quoting *Lynch v. Donnelly,* 465 U.S. 668, 690, 104 S.Ct. 1355, 1368, 79 L.Ed.2d 604 (1984)).

### (1). Secular Purpose

■■■ The Supreme Court has recognized that *Lemon* does not mandate that the government activity have an exclusively secular purpose; rather, *Lemon* only requires that at least one secular purpose exist. *See Lynch v. Donnelly,* 465 U.S. 668, 681 n. 6, 104 S.Ct. 1355, 1363, n. 6, 79 L.Ed.2d 604 (1984). However, the purpose prong "is not satisfied . . . by the mere existence of some secular purpose, however dominated by religious purposes." *Lynch,* 465 U.S. at 690–91, 104 S.Ct. at 1368. Nonetheless, several courts have acknowledged that certain kinds of prayer serve the secular purpose of "solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society." *Lynch,* 465 U.S. at 693, 104 S.Ct. at 1369–70 (O'Connor, J., concurring); *see also Jones v. Clear Creek Indep. School Dist.,* 977 F.2d 963, 967 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2950, 124 L.Ed.2d 697 (1993) (finding secular purpose in high school graduation prayers); *County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U.S. 573, 595, n. 46, 109 S.Ct. 3086, 3102, n. 46 106 L.Ed.2d 472 (1989).[10]

■■■ In this case, the Court finds persuasive those cases that have determined solemnization to be a secular purpose of graduation prayer and concludes that the benediction and invocation at issue here serve such a function. We do not find that the preeminent purpose of the invocation and benediction in question to be religious. The religious nature of a prayer is largely determined by the context of which it is a part, the entity to whom it is addressed, and the participants in it. A ceremonial prayer led by the President of the United States or by the Chaplain of Congress does not have the same religious content as a prayer offered during a particular religious body's worship services. Prayer at a university-wide commencement, which lasts a few seconds and comprises a minute portion of the overall ceremony, differs substantially from prayer at a baccalaureate service, which is expressly religious. Moreover, the Court finds compelling the secondary secular purpose of continuing to include an invocation and benediction as part of a 155–year old university tradition. *See Marsh v. Chambers,* 463 U.S. 783, 786, 790, 792, 103 S.Ct. 3330, 3333, 3335, 3336, 77 L.Ed.2d 1019 (1983). For these reasons, the Court holds that the secular purpose prong of the *Lemon* test has been satisfied.

### (2). Primary Effect to Advance Religion

■■■ Under the second prong of *Lemon,* the key inquiry is whether the university's decision to have a commencement invocation and benediction sends primarily a message of endorsement or disapproval of religion. *See Corporation of Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Amos,* 483 U.S. 327, 337, 107 S.Ct. 2862, 2869, 97 L.Ed.2d 273 (1987) ("[T]o have forbidden 'effects' under *Lemon,* it must be fair to say that the government itself has advanced religion through its own activities and influence."); *County of Allegheny v. ACLU,* 492 U.S. 573, 592–93, 109 S.Ct. 3086, 3100–01, 106 L.Ed.2d 472 (1989); *Wallace v. Jaffree,* 472 U.S. at 75, 105 S.Ct. at 2499; *Lynch,* 465 U.S. at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring). In *School Dist. of City of Grand Rapids v. Ball,* 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985), the Supreme Court observed that "an important concern of the effects test is whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the non-adherents as a disapproval, of their individual religious choices."

---

**10.** *But see Harris v. Joint School Dist. No. 241,* 41 F.3d 447, 458 (9th Cir.1994), *petition for cert. filed,* 63 USLW 3599 (Jan. 31, 1995) (finding no secular purpose in high school graduation prayers).

■ In this case, given the non-sectarian and brief nature of the invocation and benediction, as well as the sophistication of the audience and the university setting, we find that adherents and nonadherents alike could not perceive the two prayers as either endorsing or denigrating their particular religious choices or religion generally. *See Jones,* 977 F.2d at 967 (finding that because a student-led prayer did not increase the religious conviction among graduation attendees by attracting new believers or increasing faith of faithful, effects prong was satisfied). To hold otherwise is to ignore that the educative mission of the University is to expose developing young adults to a universe of new ideas and beliefs, most of which the University claims no special allegiance to. Unlike elementary and secondary school children for whom courts have repeatedly shown heightened concern, *see Ball,* 473 U.S. at 390, 105 S.Ct. at 3226; *Fleischfresser,* 15 F.3d at 686; *Sherman,* 8 F.3d at 1166, adults who have matriculated to the university level and particularly Plaintiffs, who have completed graduate-level training, do not require the Court's protection:

> University students are, of course, young adults. They are less impressionable than younger students and should be able to appreciate that the University's policy is one of neutrality toward religion.

*Widmar,* 454 U.S. at 274 n. 14, 102 S.Ct. at 276–77 n. 14 (internal quotations and citation omitted). Thus, a 30–second prayer delivered as part of larger secular ceremony "would no more commit the University . . . to religious goals than it is now committed to the goals of the Students for a Democratic Society [or] the Young Socialist Alliance." *Id.* at 274, 102 S.Ct. at 276 (internal quotation marks omitted). Indeed, Professor Tanford, an adherent of the Roman Catholic faith, has admitted as much when he stated that he does not view the non-sectarian prayer as endorsing any particular religion or

influencing people's religious beliefs. *See* Tanford Depo. at 42–43.

■ The Court realizes that there are situations where benedictions or invocations could become so sectarian, fervent or dogmatic as to send a message of disapproval of non-adherents' beliefs.[11] Even Plaintiffs seem to expect, however, that the brief invocation and benediction at issue here will not be of that nature.[12] Thus, based on the factual record before us, the Court finds that the Plaintiffs have not demonstrated a likelihood of succeeding on the second prong of *Lemon.*

### (3). Excessive Entanglement

Plaintiffs maintain that the invocation and benediction violate the excessive entanglement prong of the *Lemon* test because the University would be required to monitor the content of the prayers in order to ensure that inappropriate prayers are not given. Defendants respond that any monitoring is at most *de minimis* because the university's involvement is limited to inviting the clergypersons and giving general suggestions that the invocation and benediction be uplifting.

In *Lemon,* the Supreme Court considered whether a Rhode Island statute paying a portion of private school teachers' salaries for their secular classes constituted excessive entanglement. The Court explained that the excessive entanglement inquiry encompasses an examination of "the character and purposes of the institution that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authorities." *Lemon,* 403 U.S. at 613, 91 S.Ct. at 2111. Because the state would have to ensure that the money was not being used for religious purposes, the Court concluded that "[a] comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed

**11.** Although it is reasonable to assume that Indiana University would have altered its practices at each of its satellite campuses had the outcome of this motion been different, we emphasize that the invocations and benedictions recited at IU's other campuses are not before us. Rather, Plaintiffs constructed their lawsuit to

challenge only the Bloomington campus' university-wide ceremony.

**12.** Professor Tanford, for example, describes the prayers as merely "offensive" because they represent a "watered down nonsectarian civic religion." (Tanford Dep. at p. 28).

and the First Amendment otherwise respected." *Id.* at 616, 91 S.Ct. at 2113.

Since *Lemon,* Supreme Court cases relying on the excessive entanglement prong have largely involved an enduring association between state and religious institutions. Often the cases involved state aid to religious or parochial institutions for particular secular purposes. *See, e.g., Lemon,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745; *Ball,* 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (sending government teachers to private schools to teach secular classes constituted excessive entanglement). Other cases have involved government delegations of power to religious bodies. *See, e.g., Larkin v. Grendel's Den,* 456 U.S. 913, 102 S.Ct. 1765, 72 L.Ed.2d 171 (1982) (statute giving church-affiliated schools power to veto nearby liquor licenses struck down as excessive entanglement).

Thus, in light of this caselaw, the Court finds that the mere presence of a religious figure on the commencement stage is not excessive entanglement. In order for the entanglement to be excessive, the interplay between church and state must be more pervasive and burdensome. Nor is the limited influence that University officials traditionally exercise over the content of the prayers excessive. The University's alleged monitoring of the graduation cleric's prayers simply consists of the selection of a cleric and a reminder to him or her to include an uplifting, general message. Such interaction does not require that "a particular religion ... endure the ongoing presence of state personnel whose primary purpose is to monitor" prayer contents in "an attempt to guard against the infiltration of religious thought." *Aguilar v. Felton,* 473 U.S. 402, 413, 105 S.Ct. 3232, 3238, 87 L.Ed.2d 290 (1985). Nor does it necessitate frequent contacts between University officials and local clergy. Thus, because the degree of entanglement in the instant case is relatively minor when compared with other Establishment Clause cases, the Court finds that Plaintiffs are un-

likely to succeed on the merits of prong three.

In short, we find that the Plaintiffs have failed to establish a likelihood of succeeding on the merits under any of *Lemon's* three prongs.

## V. CONCLUSION

The issues presented by this motion are both legally and philosophically difficult. The caselaw, as well as our consciences, require that we honor two competing precepts: that what might begin as a tolerant expression of religious views may end in a policy to indoctrinate and coerce in the hands of the government; and almost paradoxically, that a "relentless and all-pervasive attempt to exclude religion from every aspect of public life could itself become inconsistent with the Constitution." *Lee,* —— U.S. at ——, 112 S.Ct. at 5661. As the Supreme Court's splintered opinions and seemingly inconsistent results in this area imply, the line between religious indoctrination and government accommodation is often obscure or illusory. Nevertheless, the true measure of constitutional adjudication "is the ability and willingness to distinguish between real threat and mere shadow." *Abington School Dist. v. Schempp,* 374 U.S. 203, 308, 83 S.Ct. 1560, 1616, 10 L.Ed.2d 844 (1963).

Given the difficulty of the task and the procedural posture of the case, the Court reminds the parties that our decision today may not be our final word on this matter. Yet we caution both sides not to become so dazzled by the art of their craft that a mutually beneficial accommodation is ignored. Both sides' briefs are replete with common sense arrangements that could be made, thus obviating the need for further court supervision. The Court does not mean to suggest that the appropriateness of a benediction at IU's commencement is not a legitimate issue for discussion. The best oracle for the declaration of religious norms, however, is in the community itself and not the federal courthouse.[13]

---

13. In this respect, the Court joins in the sentiments of Judge Guy of the Sixth Circuit:

In this age, [a state-sponsored religious activity] might reflect some insensitivity to the diver-

sity that is now America. But let us tackle the problem with some good old Yankee ingenuity—lobby for a course in comparative religions; ... form a Zen Buddhist club; wear a

Thus, for the reasons stated above, we DISMISS FOR LACK OF STANDING Plaintiff David Suess and DENY Plaintiffs' motion for a preliminary injunction.

It is so ORDERED.

t-shirt proclaiming the virtues of agnosticism; but, if I am permitted to use the expression, for heavens's sake, stay out of the courthouse and quit trivializing the Constitution.

*Washegesic v. Bloomingdale Public Schools,* 33 F.3d 679, 685 (6th Cir.1994) (Guy, J., concurring).