**PRODUCT ACTION
INTERNATIONAL,
INC., Plaintiff,**

v.

**Carl MERO, Defendant.**

**No. 1:03–CV–0881–DFH.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Aug. 5, 2003.

Alan S. Brown, Heather L. Wilson, Locke Reynolds LLP, Indianapolis, IN, for Plaintiff.

Daniel C. Emerson, Andrew M. McNeil, Bose McKinney & Evans, LLP, Indianapolis, IN, for Defendant.

## ENTRY ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT

HAMILTON, District Judge.

This diversity action presents a question concerning the extent to which Indiana law allows courts to "blue pencil" or revise a former employee's covenant not to compete with a former employer. The principal question is whether an employer can avoid the limits of the Indiana "blue pencil" doctrine by including in the agreement language to the effect that a court should enforce the agreement "to the extent permitted by law." This court predicts that the answer under Indiana law is no.

Plaintiff Product Action International, Inc. ("PAI") has sued a former salesman, defendant Carl Mero, to enforce a covenant not to compete in an employment agreement. After PAI moved for a pre-liminary injunction, the parties agreed that the court should first decide as a matter of law the enforceability of the covenant not to compete. That issue has been presented by the parties' cross-motions for partial summary judgment, which were argued to the court on July 17, 2003. That same day, the court orally granted defendant Mero's motion for partial summary judgment and denied PAI's motion for partial summary judgment, and now states more fully its reasons.

In summary, the covenant not to compete lacks any reasonable limit in terms of geography or customers. Indiana law does not authorize the court to add terms to the parties' contract to fashion a reasonable limit. The contract states that any overly broad restriction "shall be enforced to the maximum extent permitted by law." That provision, however, is merely an invitation to the court to rewrite the parties' agreement so as to transform a facially unreasonable agreement into a reasonable one. Indiana law does not authorize courts to play such a role. The covenant not to compete therefore is not enforceable.

*Stipulated and Undisputed Facts*

PAI is an Indiana corporation with its principal office in Hamilton County, Indiana. Defendant Carl Mero is a resident and citizen of Michigan. The amount in controversy exceeds $75,000.

Mero was employed by PAI as a Regional Sales Manager working out of PAI's Plymouth, Michigan office from April 22, 2002 through February 6, 2003, when PAI fired him. Mero sold PAI's inspection containment services to the automotive industry. Mero's territory for PAI consisted of the northwest side of Michigan, including part of Flint, Lansing, Holland, Muskegon, and Saginaw.

Mero and PAI entered into a Confidentiality/Non–Competition Agreement dated

April 22, 2002 and drafted by PAI. The agreement provides that it shall be interpreted and enforced under Indiana law, and the parties agree that Indiana law applies. Paragraph 9(B) of the agreement provides:

> For a period of twenty-four (24) months immediately following the termination of this Agreement or Employee's employment, regardless of the reason for termination, or for such other period of time permitted by the fullest extent of law, Employee shall not, directly or indirectly, in any individual or representative capacity, own, organize, initiate, accept employment with, engage with, participate with, consult with or assist a "Competitive Business" in any way. As used in this Agreement, the term "Competitive Business" means any individual, company, entity, or business that is engaged in providing quality control assistance or services to manufacturers, and:
>
> (i) does business with, or seeks to do business with, any Present Customer of PAI; or
>
> (ii) does business in or seeks to do business within an one hundred (100) mile radius of any warehouse, office or facility where PAI does business; or
>
> (iii) during the twelve (12) months immediately preceding did business in any state of the United States or in any foreign country in which PAI does business or is planning to do business at the time Employee leaves PAI.

Pl.Ex. 1, Confidentiality/Non–Competition Agreement, ¶ 9(B). Paragraph 10 of the agreement further provides in part: "If the scope of any stated restriction is too broad to permit enforcement of such restriction to its fullest extent, then such restriction shall be enforced to the maximum extent permitted by law and that the court making such determination shall have the power to modify this Agreement in order for it to conform with the applicable law."

On February 24, 2003, Mero became employed as a salesman by Quality Industrial Services, Inc. ("QIS"), a business located in Romulus, Michigan. QIS and PAI both perform quality assurance and quality control inspection work for the automotive industry. QIS qualifies as a "Competitive Business" under the non-competition agreement because QIS is a "company, entity, or business that is engaged in providing quality control assistance or services to manufacturers." QIS also fits each of the three alternative criteria in Paragraph 9(B) so as to bar Mero from working for it. First, QIS "does business with, or seeks to do business with, any Present Customer of PAI." See id., ¶ 9(B)(i). Second, QIS also "does business in, or seeks to do business within an one hundred (100) mile radius of any warehouse, office, or facility where PAI does business." See id., ¶ 9(B)(ii). QIS also, during the twelve months immediately preceding Mero's discharge, did business in one or more states of the United States or in a foreign country in which PAI does business or was planning to do business at the time he left PAI. See id., ¶ 9(B)(iii).[1]

QIS employs Mero as a salesman in its office located in Troy, Michigan. Troy is approximately 20 to 30 miles from Plymouth, where Mero had his PAI office. His sales territory with QIS encompasses northern Michigan, extending north from Troy, Michigan (excluding Detroit). Mero

---

1. For purposes of the hearing on July 17, 2003, PAI did not allege that Mero breached the agreement's Paragraph 8, which bars "raids" on other PAI employees, or Paragraph 9(A), which bars the employee from being hired by a PAI customer. PAI has reserved the right to make such allegations in the future.

performs services for QIS within 100 miles of Plymouth.

PAI has warehouses in: Plymouth, Michigan; Marysville, Ohio; Tuscaloosa, Alabama; and Indianapolis, Indiana. PAI has offices in: Battle Creek, Holland, Princeton, and Plymouth, Michigan; Indianapolis and Mishawaka, Indiana; Toledo and Dayton, Ohio; Georgetown, Kentucky; Vance, Huntsville, and Lincoln, Alabama; Nashville, Tennessee; and Greenville, South Carolina. In addition, PAI does business in warehouses, offices or facilities belonging to customers, including locations in Chicago, Illinois; the state of Wisconsin; Canton, Mississippi; and Windsor and St. Catherine, Ontario, Canada.

PAI provided Mero with one week of sales training, during which PAI showed him how to sell its products and discussed marketing strategies. After that initial week of training by PAI, Mero traveled to various PAI locations as part of his training, including Ohio, Kentucky and Indiana. While employed at PAI, Mero worked with PAI customers including but not limited to Borg–Warner; Visteon; Metaldyne; Polynorm; Emhart Banal; General Motors Assembly at Lake Orion, Michigan; Ford Livonia Transmission; and the Bing Group.

Less than two weeks after his discharge by PAI, Mero contacted QIS about coming to work for it as a salesman. Mero knew that QIS was in the same industry of inspection, containment and light assembly as PAI, and he considered QIS to be a competitor of PAI. Mero received no specific sales training from QIS. Mero is working in the suburban Detroit area for QIS, and his work for QIS has primarily been within a 100 mile radius of where he worked for PAI.

While working for QIS, Mero has contacted some businesses that also do business or have done business with PAI. While working for QIS, Mero has called on six of the same customers that he called upon while working for PAI. In fact, after being fired by PAI, Mero has obtained business for QIS from customers he also called upon while employed at PAI.

### Discussion

The stipulated facts show that Mero's current activities—competing with PAI in his old territory, including calling on some of his old PAI customers—fall within the scope of Paragraph 9(B) of the covenant as written. The question now before the court is whether Paragraph 9(B) is enforceable against Mero.

I. *Indiana Law on Covenants Not to Compete*

Under Indiana law, non-competition covenants are not favored by the law because they restrain trade. *Licocci v. Cardinal Associates, Inc.,* 445 N.E.2d 556, 561 (Ind.1983); accord, *Harvest Ins. Agency, Inc. v. Inter–Ocean Ins. Co.,* 492 N.E.2d 686, 688 (Ind.1986). Such agreements are construed strictly against the covenantee. Nevertheless, they will be enforced if they are reasonable in scope and if they are ancillary to an employment agreement or the sale of a business. *JAK Productions, Inc. v. Wiza,* 986 F.2d 1080, 1085 (7th Cir.1993) (applying Indiana law); see also *Licocci,* 445 N.E.2d at 561.

Under the "strict construction" approach, even if it would have been possible to write a reasonable covenant that barred the former employee's activities, a covenant will not be enforced if its enforcement would be unreasonable under any set of facts. *Young v. Van Zandt,* 449 N.E.2d 300, 304 (Ind.App.1983), citing *4408, Inc. v. Losure,* 175 Ind.App. 658, 373 N.E.2d 899, 900–01 (1978). "[T]he court may not create a reasonable restriction under the guise of interpretation, since this would subject the parties to an agreement they had not made." *Young,* 449 N.E.2d at 304,

citing *Licocci*, 445 N.E.2d at 561 and *Donahue v. Permacel Tape Corp.*, 234 Ind. 398, 127 N.E.2d 235, 241 (1955). Accordingly, Indiana law strongly discourages employers' attempts to draft unreasonably broad and oppressive covenants.

■ As a counterweight to this strict construction, however, Indiana courts have adopted what has become known as the "blue pencil" doctrine. This doctrine allows a court to delete unreasonable restrictions from an otherwise enforceable covenant if the restrictions are severable, and to enforce the reasonable restrictions. *JAK Productions, Inc. v. Wiza*, 986 F.2d 1080, 1087 (7th Cir.1993) ("In Indiana, the blue pencil doctrine applies to a covenant not to compete that is severable in its terms."), citing *Young*, 449 N.E.2d at 304; *Licocci*, 445 N.E.2d at 561, citing *Welcome Wagon, Inc. v. Haschert*, 125 Ind.App. 503, 127 N.E.2d 103, 106 (1955). "Where the covenant is both unreasonable and incapable of redaction, it will be unenforceable." *Young*, 449 N.E.2d at 304.

■ Whether a covenant not to compete is reasonable is measured in terms of whether the employer has a protectable interest and whether the restraint on competition is reasonable in terms of its scope. *E.g., Licocci*, 445 N.E.2d at 561; *Donahue*,

127 N.E.2d at 239–40. "In considering what is reasonable, regard must be paid to: (a) the question whether the promise is wider than is necessary for the protection of the covenantee in some legitimate interest; (b) the effect of the promise upon the covenantor; and (c) the effect upon the public." *Medical Specialists, Inc. v. Sleweon*, 652 N.E.2d 517, 522 (Ind.App.1995), citing *Donahue*, 127 N.E.2d at 239. Under Indiana law, whether the covenant not to compete is reasonable is a question of law for the court to decide. *Licocci*, 445 N.E.2d at 561.[2]

## II. *The Parties' Agreement as Written*

The parties' agreement as written here is unreasonably broad. It is not enforceable as written because it lacks reasonable limits in terms of the customers or geographic area to which it applies.

The parties agree here that PAI has a protectable interest in its relationships with its customers. Where customer relationships depend in substantial part on goodwill and personal contacts between sales representatives and customers, an employer will often have such a protectable interest. See, *e.g., Field v. Alexander & Alexander of Indiana, Inc.*, 503 N.E.2d 627, 633 (Ind.App.1987); *Licocci*, 445

2. In cases with covenants not to compete ancillary to employment, Indiana courts require that the scope of the covenant be narrower than in cases with covenants ancillary to the sale of a business. See *Kladis v. Nick's Patio, Inc.*, 735 N.E.2d 1216, 1220 (Ind.App. 2000), citing *Fogle v. Shah*, 539 N.E.2d 500, 502 (Ind.App.1989). In *Fogle*, the Indiana Court of Appeals noted the distinction between the two situations:

In the former situation (sale of a business) there is more likely to be equal bargaining power between the parties; the proceeds of the sale generally enable the seller to support himself temporarily without the immediate practical need to enter into competition with his former business; and a seller is usually paid a premium for agreeing not

to compete with the buyer. Where the sale of the business includes good will, as this sale did, a broad noncompetition agreement may be necessary to assure that the buyer receives that which he purchased.... On the other hand, an ordinary employee typically has only his own labor or skills to sell and often is not in a position to bargain with his employer. Postemployment restraints in such cases must be scrutinized carefully to see that they go no further than necessary to protect an employer's legitimate interests, such as trade secrets or confidential customer information.

*Fogle*, 539 N.E.2d at 502, quoting *Alexander & Alexander, Inc. v. Danahy*, 21 Mass.App.Ct. 488, 488 N.E.2d 22, 28 (1986).

N.E.2d at 563; *Donahue,* 127 N.E.2d at 240.

The parties also agree that the two year time limit in Paragraph 9(B) is reasonable under the circumstances here. That point of agreement is also consistent with Indiana law, which considers the specific nature of the employer's protectable interest in evaluating whether a covenant is reasonable in duration. See, *e.g., Standard Register Co. v. Cleaver,* 30 F.Supp.2d 1084, 1098 (N.D.Ind.1998) (two years reasonable under the circumstances).

■ The decisive issue here is the scope of the covenant not to compete in terms of geography and/or customers. A covenant not to compete must be reasonably limited in terms of geography, and the geographic limit must ordinarily be no broader than the scope of the employee's former responsibilities. *E.g., Donahue,* 127 N.E.2d at 241; *Vukovich v. Coleman,* 789 N.E.2d 520, 525 (Ind.App.2003); *Medical Specialists,* 652 N.E.2d at 523–24. Instead of a geographic limit, though, a limit as to a group of customers can serve the same limiting function to keep a covenant within reasonable bounds. *E.g., Standard Register,* 30 F.Supp.2d at 1096; *Norlund v. Faust,* 675 N.E.2d 1142, 1155 (Ind.App. 1997) ("The use of territorial boundaries is only one method of limiting a covenant's scope, and when a covenant not to compete contains a restraint which clearly defines a class of persons with whom contact is prohibited, the need for a geographical restraint is decreased."), citing *Field,* 503 N.E.2d at 635, and *Seach v. Richards, Dieterle & Co.,* 439 N.E.2d 208, 213 (Ind. App.1982); *Commercial Bankers Life Ins. Co. of America v. Smith,* 516 N.E.2d 110, 114 (Ind.App.1987). The limits, whether in terms of geography or customers, must be reasonably congruent with the employer's protectable interest. *Standard Register,* 30 F.Supp.2d at 1096; *Smart Corp. v. Grider,* 650 N.E.2d 80, 83 (Ind.App.1995) ("A covenant not to compete must be sufficiently specific in scope to coincide with only the legitimate interests of the employer ....."), citing *Field,* 503 N.E.2d at 635.[3]

The parties agree that it would have been possible for PAI to write an enforceable covenant that prohibited Mero from doing what he is doing—competing against PAI in his old geographic territory and for some of his old PAI customers. The fact that such an agreement might have been written and enforced does not mean, however, that the parties' agreement as written may be enforced. The court does not have the authority to rewrite the parties' contract for them in order to create and then impose an enforceable prohibition on the former employee. Apart from the "blue pencil" doctrine discussed in detail below, if the agreement as drafted is unreasonably broad, it cannot be enforced in part on the theory that the parties could have agreed to some more reasonable terms.

■ As written, the covenant in Paragraph 9(B) does not contain any geographic or customer limitations. Instead, it imposes limits in terms of what amounts to a "Competitive Business" within the meaning of the agreement. If a prospective employer fits the definition in Paragraph 9(B), then the plain language of the agreement prohibits Mero from working for that employer in any location, in any capacity, and with any customers.

---

**3.** The general requirement for geographic or customer limits tied to the former employee's own activities may not apply if a broader covenant is necessary to protect the employer's genuine trade secrets. See *Donahue v. Permacel Tape Corp.,* 234 Ind. 398, 127 N.E.2d 235, 239 (1955); accord, *Ackerman v. Kimball Int'l, Inc.,* 652 N.E.2d 507, 510 (Ind. 1995) (*dicta*).

As written, Paragraph 9(B) reaches far beyond any protectable interest and is unreasonable in its scope. Working from the bottom up, Paragraph 9(B)(iii) bars Mero from working for any competitor which, during his last year of employment with PAI, did business in any state of the United States, or in any foreign country in which PAI did business or planned to do business when Mero left PAI.

By way of illustration, consider PAI's offices in Ontario, Canada. By its terms, Paragraph 9(B)(iii) would bar Mero from working for any competitor who had a single customer in Vancouver, Calgary, or Nova Scotia. Paragraph 9(B)(iii) would also bar Mero from working for a competitor that had just one customer in Michigan, Ohio, Indiana, Kentucky, Alabama, Tennessee, Illinois, Wisconsin, Mississippi, or South Carolina—the states where PAI had facilities or offices when Mero left. In fact, Paragraph 9(B)(iii) would bar Mero from working anywhere and in any capacity for a competitor that had a customer in a state where someone in PAI's hierarchy was merely "planning" to do business when Mero left, regardless of whether Mero knew about the plan or would have any connection with the potential PAI customer.

Paragraph 9(B)(ii) bars Mero from working for a competitor that does business in or seeks to do business within a 100 mile radius of any PAI warehouse, office or facility. This provision is also overly broad because it reaches far beyond PAI's legitimate protectable interest. Again, suppose a competitor had an office in Michigan within 100 miles of PAI's offices there. Paragraph 9(B)(ii) would prohibit Mero from working for that same company in California or Pennsylvania or even a foreign country, in places where PAI does no business at all, and it would prohibit such work even if he were calling on customers who were not even potential customers of PAI.

Paragraph 9(B)(i) bars Mero from working for any competitor that does business with or seeks to do business with any "Present Customer" of PAI. As written, this prohibition applies regardless of geography, regardless of whether Mero's competing work would have anything to do with any "Present Customer" of PAI, and regardless of whether Mero had any contact with such PAI customers. Accordingly, this provision also fails to impose any reasonable limit in terms of geography or customers. It reaches far beyond PAI's protectable interest. See, e.g., Standard Register, 30 F.Supp.2d at 1097 (deleting covenant provision that would have barred employee from contacting those who were not customers in the past); cf. Cohoon v. Financial Plans & Strategies, Inc., 760 N.E.2d 190, 195–96 (Ind.App.2001) (enforcing covenant that prohibited former employee from contacting clients and contacts with whom employer had done business in past year); Hahn v. Drees, Perugini & Co., 581 N.E.2d 457, 461 (Ind.App.1991) (striking prohibition on competing for employer's past customers but enforcing prohibition on present customers with whom departing employees had contact).

## III.   The "Blue Pencil" Doctrine

In light of the flaws in the agreement as written, PAI seeks to invoke the "blue pencil" doctrine under Indiana law on covenants not to compete. Under that doctrine, if a covenant is clearly separated into parts, and if some parts are reasonable and others are not, the contract may be severed, or "blue penciled," so that the reasonable portions may be enforced. Licocci v. Cardinal Associates, 445 N.E.2d 556, 561 (Ind.1983) ("if the covenant is clearly separated into parts and some parts are reasonable and others are not,

the contract may be held divisible"). Such efforts to save a covenant are limited to applying terms that already exist in the contract; the court may not add terms. *Id.; JAK Productions, Inc. v. Wiza,* 986 F.2d 1080, 1087 (7th Cir.1993); *Burk v. Heritage Food Service Equipment, Inc.,* 737 N.E.2d 803, 814–15 (Ind.App.2000); *Smart Corp. v. Grider,* 650 N.E.2d 80, 83–84 (Ind.App.1995); *Hahn v. Drees, Perugini & Co.,* 581 N.E.2d at 462; *Young v. Van Zandt,* 449 N.E.2d 300, 304 (Ind.App. 1983); *Seach v. Richards, Dieterle & Co.,* 439 N.E.2d 208, 215 (Ind.App.1982); see also *Bridgestone/Firestone, Inc. v. Lockhart,* 5 F.Supp.2d 667, 683–84 (S.D.Ind. 1998).

PAI suggests two ways of saving some part of Paragraph 9(B). Neither is persuasive.

A. *PAI's Proposal to Delete Language*

PAI's first proposed solution is set forth in its brief. The proposal is that Paragraph 9(B) be edited as follows:

> For a period of twenty-four (24) months immediately following the termination of this Agreement or Employee's employment, regardless of the reason for termination, or for such other period of time permitted by the fullest extent of law, Employee shall not, directly or indirectly, in any individual or representative capacity, own, organize, initiate, accept employment with, engage with, participate with, consult with or assist a "Competitive Business" ~~in any way~~. As used in this Agreement, the term "Competitive Business" means any individual, company, entity, or business that is engaged in providing quality control assistance or services to manufacturers, and:
>
> (i) does business with, ~~or seeks to do business with,~~ any ~~Present~~ Customer of PAI~~; or~~
>
> (ii) ~~does business in or seeks to do business within an one hundred (100)~~ ~~mile radius of any warehouse, office or facility where PAI does business; or~~
>
> (iii) ~~during the twelve (12) months immediately preceding did business in any state of the United States or in any foreign country] in which PAI does business or is planning to do business at the time Employee leaves PAI.~~

The proposed editing would result in a narrower definition of a prohibited employer, but for the reasons explained above regarding Paragraph 9(B)(i), would not cure the problem. The edited version would still fail to link the prohibitions to the scope of Mero's activities and would not include a geographic or customer restriction that would apply to Mero's activities. The lack of congruence between the prohibition and PAI's protectable interest would remain.

B. *PAI's Proposal to Enforce Restrictions "To the Maximum Extent Permitted by Law"*

Next, PAI relies on the provision in Paragraph 10 that any overly broad restriction "shall be enforced to the maximum extent permitted by law." PAI argues that the provision gives the court the power to modify the scope of the agreement to conform it to applicable law. PAI proposes that the court invoke this power and enforce a prohibition on competing against PAI in Mero's former territory and for the customers that he served for PAI. Like the parties, the court is confident that such a prohibition would have been reasonable—if the parties had drafted the contract that way. But that is not how they drafted it. PAI is asking the court to rewrite the agreement, not only by deleting terms from the agreement but also by adding new restrictions to make it reasonable.

PAI's proposal is contrary to Indiana law, which leaves to the parties the task of writing an agreement. Carrying out PAI's proposal would require the court to add terms that the parties never agreed to. That is exactly what Indiana courts have repeatedly said they would not do. *E.g., Licocci v. Cardinal Associates*, 445 N.E.2d 556, 561 (Ind.1983) ("courts may not create a reasonable restriction under the guise of interpretation, since this would subject the parties to an agreement they had not made"); *Burk v. Heritage Food Service Equipment, Inc.*, 737 N.E.2d 803, 814–15 (Ind.App.2000) (affirming deletion of prohibition on contacting "past" customers while enforcing prohibition on contacting present customers); *Smart Corp. v. Grider*, 650 N.E.2d 80, 83–84 (Ind.App.1995); *Hahn v. Drees, Perugini & Co.*, 581 N.E.2d 457, 462 (Ind.App.1991) (deleting words to bar contact with past and prospective customers and to allow contact with present customers of former employer); *Young v. Van Zandt*, 449 N.E.2d 300, 304 (Ind.App.1983) (holding covenant was not enforceable because "no language in the covenant ... may be stricken in order to remedy this deficiency"); *Seach v. Richards, Dieterle & Co.*, 439 N.E.2d 208, 215 (Ind.App.1982) (deleting words to bar contact with past and prospective customers and to allow contact with present customers of former employer); see also *JAK Productions, Inc. v. Wiza*, 986 F.2d 1080, 1087 (7th Cir.1993) (affirming deletions of language that rendered covenant too broad); *Bridgestone/Firestone, Inc. v. Lockhart*, 5 F.Supp.2d 667, 684 (S.D.Ind. 1998) (finding that portions of covenant could be severed, but that each portion was unreasonable unless court added language, which Indiana law prohibits).

PAI finds support from the majority opinion in *Smart Corp. v. Grider*, 650 N.E.2d 80, 84–85 (Ind.App.1995), for its proposal to rely on the phrase "to the maximum extent permitted by law." In that case, the former employee had worked only in Indiana. As drafted, the covenant barred her from competing "in any county of any state in the United States of America where the Company or any affiliate or successor thereof then carries on a like business to that presently conducted by the Company in the County of Los Angeles, California, to the extent permitted by applicable law...." *Id.* at 82. Because the employee had worked only in Indiana, the nationwide prohibition was unreasonably broad. Despite this conclusion, the majority invoked the "blue pencil" doctrine to delete all of the language quoted above except the phrase "to the extent permitted by law." The edited version then stated that the "Employee will not ... to the extent permitted by applicable law" compete with plaintiff. The court relied on the phrase "to the extent permitted by applicable law" and barred competition only within the former employee's old territory, the state of Indiana. *Id.* at 84–85.

As long as the drafter of the contract has included some similar language about enforcing the agreement to the extent permitted by law, there is no practical difference between the majority's approach in *Smart Corp.* and one that simply states that an unreasonably broad agreement will be enforced to the extent it is reasonable. Yet that is an approach that the Indiana Supreme Court and Court of Appeals have steadfastly rejected in all other reported cases, including those cited above at page 17. See, *e.g., Licocci*, 445 N.E.2d at 561 ("if the covenant as written is not reasonable, the courts may not create a reasonable restriction under the guise of interpretation, since this would subject the parties to an agreement they had not made").

The *Smart Corp.* majority obviously recognized how difficult it was to reconcile its

decision with Indiana's blue pencil doctrine. The majority took pains to deny that it was setting any such precedent:

> We do not intend to sanction the use of such broad, 'catch-all' language in covenants not to compete. Obviously, since noncompetition agreements are not favored in law, more precise language should be employed to define the limitations of the restrictions. However, under the circumstances and posture of the present case, we will not hesitate to blue pencil the overbroad language and give effect to the 'catch all' language to enforce the reasonable intentions of the parties as manifested by their written agreement.

*Id.* at 85 n. 1.

In other words, the majority in *Smart Corp.* seemed to deny that it was setting a precedent that would allow employers to draft agreements with overly broad terms, to include an agreement to allow partial enforcement to the extent permitted by law, and then to have a court fashion an agreement that would be reasonable. Yet that is precisely what the *Smart Corp.* majority did, while acknowledging in footnote 1 how difficult it was to reconcile its approach with the well-established boundaries of the blue pencil doctrine.

Judge Staton pointed out these flaws in dissent. He wrote that the majority's approach "impermissibly rewrites the parties' contract," and that it was "well settled that this court may not use the guise of interpretation to create a reasonable restriction from an otherwise unreasonable one; doing so subjects the parties to an agreement that they did not make." 650 N.E.2d at 85 (Staton, J., dissenting), citing *Licocci,* 445 N.E.2d at 561. He added: "By striking the geographical limitation expressed in the contract and creating a legally reasonable limitation where one does not exist, the Majority in effect has

become a party to the contract." 650 N.E.2d at 85.

In this diversity jurisdiction case, this court's responsibility is to resolve questions of Indiana law by predicting how the Indiana Supreme Court would decide the question if this case were before it today. *Woidtke v. St. Clair County,* 335 F.3d 558, 561–62 (7th Cir.2003); *Research Sys. Corp. v. IPSOS Publicite,* 276 F.3d 914, 925 (7th Cir.2002). If the state's highest court has not ruled on an issue, the Seventh Circuit reads intermediate appellate decisions as providing a strong indication of how the highest court would rule unless there is a persuasive reason to believe otherwise. *General Accident Ins. Co. of America v. Gonzales,* 86 F.3d 673, 675 (7th Cir.1996). Where one decision by an intermediate court is out of step with the weight of authority from both the state's highest court and other panels of the intermediate court, though, that decision is unlikely to provide a reliable basis for predicting state law.

This court predicts that the Indiana Supreme Court would not approve the approach of the *Smart Corp.* majority, for that approach would mean the end of Indiana's blue pencil doctrine. It would be an open invitation for employers to draft covenants that are obviously too broad in terms of time and geography and types of competition or potential competition. By adding a magic phrase so that the overly broad restrictions may be enforced "to the extent permitted by law," the parties would delegate to the courts the task of drafting reasonable agreements.

The blue pencil doctrine is subject to criticism as being too mechanical and sometimes producing arbitrary results. See, *e.g., Data Management, Inc. v. Greene,* 757 P.2d 62, 64 (Alaska 1988) (under blue pencil rule, "if a seller promised not to compete 'anywhere in England,' the

whole provision would be void because the quoted clause cannot be narrowed by deleting any words. On the other hand, if the seller promised not to compete 'in London or elsewhere in England,' the covenant would be enforceable as to London because 'elsewhere in England' could be 'blue pencilled.' "). Accordingly, some states have decided to allow such judicial modification of overly broad agreements, at least if the employer has acted in good faith in drafting the agreement. See, *e.g.*, *Data Management*, 757 P.2d at 64–65; *Central Adjustment Bureau, Inc. v. Ingram*, 678 S.W.2d 28, 37 (Tenn.1984); *Sidco Paper Co. v. Aaron*, 465 Pa. 586, 351 A.2d 250, 256–57 (1976); *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, 325 N.E.2d 544, 546–47 (1975) (abandoning blue pencil doctrine and establishing rule that courts may modify covenants by adding or subtracting terms in order to make them reasonable); *All Stainless, Inc. v. Colby*, 364 Mass. 773, 308 N.E.2d 481, 485–86 (1974) ("If the covenant is too broad in time, in space, or in any other respect, it will be enforced only to the extent that it is reasonable ...."); *Ehlers v. Iowa Warehouse Co.*, 188 N.W.2d 368, 370 (Iowa 1971) (overruling prior blue pencil doctrine). This approach also has the support of prominent commentators on contract law, who express great confidence in the ability of courts to distinguish between overly broad covenants written in good faith and overly broad covenants written to oppress employees. See Restatement (Second) of Contracts § 184 (1981); Williston on Contracts § 13:22 at 813–16 (4th ed.1995). Their positions on this point have not commanded universal agreement from state courts.

Indiana and other states have refused such invitations to rewrite parties' agreements, whether the invitation is explicit in the covenant or not. Among the courts in other states that have also refused to enforce unreasonable covenants to a reason-able extent and refused to give effect to contract provisions stating that a court may narrow the contract to enforce it include, see, *e.g.*, *Valley Medical Specialists v. Farber*, 194 Ariz. 363, 982 P.2d 1277, 1286 (1999) (reversing lower court's reliance on similar provision to enforce partially an overly broad covenant); *CAE Vanguard, Inc. v. Newman*, 246 Neb. 334, 518 N.W.2d 652, 656 (1994) (reversing trial court's reformation of unreasonable covenant; stating that it is not the court's function to reform unreasonable covenants, and that contract provision inviting such reformation may not confer on a court a power it does not possess); *Bayly, Martin & Fay, Inc. v. Pickard*, 780 P.2d 1168, 1175 (Okla.1989) ("The insertion of a provision in the three agreements permitting modification does not alter the fact that the Court would have to rewrite the contracts to make them reasonable."); *Rector–Phillips–Morse, Inc. v. Vroman*, 253 Ark. 750, 489 S.W.2d 1, 5 (1973) (affirming refusal to give effect to contract provision for enforcement to extent necessary; approach would amount to "judicial rewriting of the parties' contract" and would have "clear tendency to provoke unnecessary litigation"); see also *General Medical Corp. v. Kobs*, 179 Wis.2d 422, 507 N.W.2d 381, 384–85 (1993) (applying Wisconsin statute providing "Any ... restrictive covenant imposing an unreasonable restraint is illegal, void and unenforceable even as to so much of the covenant ... as would be a reasonable restraint.").

Courts in Indiana and other states have had sound reasons for rejecting such invitations to enforce unreasonable covenants only to the extent they are reasonable. Under the *Smart Corp.* majority's approach, and that advocated by the Restatement (Second), Professor Williston, and other courts, neither the employee nor the employer could expect any guidance from the terms of their agreement. A prospec-

tive new employer also could not read the agreement and know what sorts of activity would be prohibited and what would not. Yet Indiana courts have insisted that the employee be able to have a clear understanding of what conduct is prohibited by the contract. *E.g., Cohoon v. Financial Plans & Strategies, Inc.,* 760 N.E.2d 190, 195 (Ind.App.2001); *Titus v. Rheitone Inc.,* 758 N.E.2d 85, 93 (Ind.App.2001); *Field,* 503 N.E.2d at 635. And as noted above, Indiana courts have resisted invitations to write contracts for parties.

PAI's proposed approach has some superficial appeal on the theory that it results in enforcement of reasonable prohibitions that the contracting parties intended. Courts taking this approach have often written in terms of enforcing "the parties' reasonable intentions," *e.g., Smart Corp.,* 650 N.E.2d at 85; *Central Adjustment Bureau,* 678 S.W.2d at 37. As noted, this approach puts courts in the uncomfortable and unfamiliar role of making contracts for the parties. The approach also closes the judicial eye to the reality of the problem and the power that employers usually hold over their current and former employees in cases of covenants not to compete.

As a practical matter, such unreasonably broad contracts often have *in terrorem* effects on current and former employees.[4] A current employee may be frozen in his or her job by an unreasonably broad covenant. Even if the employee believes the covenant is too broad, she may be able to test that proposition only through expensive and risky litigation. Similarly, a former employee—especially one who has been fired against his will—is often unable or unwilling to take on the expense of legal counsel and the risk of litigation to assert his right to be free from such overreaching by a former employer. See, *e.g., Sidco Paper Co. v. Aaron,* 351 A.2d at 261 n. 1 (Nix, J., dissenting) ("Many employees are deterred from testing the legality of unreasonably onerous restrictions because of the

---

4. Numerous other courts have noted the *in terrorem* effects of overly broad covenants. *E.g., Valley Medical Specialists v. Farber,* 194 Ariz. 363, 982 P.2d 1277, 1286 (1999) ("For every agreement that makes its way to court, many more do not. Thus, the words of the covenant have an *in terrorem* effect on departing employees. Employers may therefore create ominous covenants, knowing that if the words are challenged, courts will modify the agreement to make it enforceable. Although we will tolerate ignoring severable portions of a covenant to make it more reasonable, we will not permit courts to add terms or rewrite provisions.") (internal citations omitted); *Reddy v. Community Health Foundation of Man,* 171 W.Va. 368, 298 S.E.2d 906, 916 (1982) ("where savage covenants are included in employment contracts so that their overbreadth operates, by *in terrorem* effect, to subjugate employees unaware of the tentative nature of such a covenant, we will find the covenant void"); *Richard P. Rita Personnel Services Intern., Inc. v. Kot,* 229 Ga. 314, 191 S.E.2d 79, 81 (1972), citing Blake, 73 Harv. L.Rev. 625, 682–83 (1960) ("For every covenant that finds its way to court, there are thousands which exercise an *in terrorem* effect on employees who respect their contractual obligations and on competitors who fear legal complications if they employ a covenantor, or who are anxious to maintain gentlemanly [sic] relations with their competitors. Thus, the mobility of untold numbers of employees is restricted by the intimidation of restrictions whose severity no court would sanction. If severance is generally applied, employers can fashion truly ominous covenants with confidence that they will be pared down and enforced when the facts of a particular case are not unreasonable. This smacks of having one's employee's cake, and eating it too."); but see *Raimonde v. Van Vlerah,* 42 Ohio St.2d 21, 325 N.E.2d 544, (1975) ("Appellee argues that adoption of a rule of reasonableness would allow employers to dictate restraints without fear, knowing that judges will rewrite contracts if they are taken to court. Such a contention is without merit. Most employers who enter contracts do so in good faith, and seek only to protect legitimate interests. In fact, relatively few employment contracts reach the courts.").

expense and vicissitudes of litigation. Thus they are condemned to have legitimate options forever foreclosed because of the fear of a violation of an unreasonable and excessive restriction."). When a former employee (often with the help of a new employer) does stand up for his rights, the courts need not do for the employer what it should have done in the first place—write a reasonable covenant. Under Indiana law, there is a consequence for such overreaching. The consequence is that the covenant cannot be enforced at all.

The Indiana courts' refusal to rewrite agreements for parties can also be consistent with the parties' intentions. When an employer hands an employee an employment agreement with a covenant not to compete, the employee is of course entitled to consult a lawyer before signing the agreement. If the employer has drafted an unreasonably broad covenant, the employee should be entitled to rely on sound advice that the covenant is simply not enforceable under Indiana law. That employee's intent may well have been not to agree to *any* enforceable restriction. That same employee could sign quite happily a covenant, knowing that the courts would shred it.[5]

Finally, as for Professor Williston's and the Restatement (Second)'s suggestion, adopted in some jurisdictions but not in Indiana, that abuses can be avoided by refusing to enforce overly broad covenants where the employer acted in bad faith, Justice Smith's opinion for the Supreme Court of Arkansas suggests the rebuttal: "That solution is apt to be ineffective, for the employer, forewarned, has only to make a restrictive contract ostensibly within the outer boundaries of reasonableness to avoid the penalty proposed by Williston." *Rector–Phillips–Morse,* 489 S.W.2d at 5. The Williston–Restatement solution to the problem of overreaching can even aggravate the *in terrorem* effects for a departing employee who seeks legal advice on what is and what is not permitted where the written covenant is unreasonably broad. By inviting courts to decide the extent of reasonable prohibitions, and by requiring courts to decide whether overly broad restrictions were drafted in good faith or not, the "rule of reasonableness" requires counsel to consider two layers of uncertainty. The result is to introduce still more expense and paralyzing uncertainty into the situation.

Although Indiana's blue pencil rule is not a perfect solution to the problem that has divided courts and commentators, it is a sound and reasonable one. It balances the employer's and employee's interests, gives the employer a fair opportunity to draft a reasonable and enforceable covenant, protects the employee by discouraging the employer from overreaching, and provides a rather mechanical but reasonably predictable answer in the case of overly broad covenants. And for purposes of this federal court exercising diversity jurisdiction, the most pertinent point, of course, is that the Indiana blue pencil rule is the rule chosen by the Indiana courts. This court's obligation is to follow and apply that rule.

The court recognizes that the result in this case—denying enforcement of a covenant not to compete when its former em-

---

5. For example, the legal profession has essentially exempted itself from such covenants not to compete. Rule 5.6(a) of the Indiana Rules of Professional Conduct provides that a lawyer shall not participate in offering or making "a partnership or employment agreement that restricts the rights of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement." A new lawyer who signs such a covenant not to compete with an employer can count on the fact that courts would never enforce it.

ployee is competing in his old territory and for his old customers—can be frustrating for businesses in PAI's situation. However, it would have been possible for PAI to write an enforceable contract that prohibited Mero from doing what he is doing. Such a contract would have prohibited competing contacts with his PAI customers and/or in his old PAI territory. That is not what PAI did. For reasons of its own, it chose instead to write an unreasonably broad contract. Under Indiana law, Paragraph 9(B) therefore is not enforceable. Defendant Mero's motion for partial summary judgment on that question has been granted, and plaintiff's motion to the contrary has been denied.